DAN RAYFIELD
Attorney General
BRIAN SIMMONDS MARSHALL #196129
NINA ENGLANDER #106119
Senior Assistants Attorney General
DEREK OLSON #225504
Assistant Attorney General
Trial Attorneys
Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: 971-673-1880
Fax: 971-673-5000
Email:  Brian.S.Marshall@doj.oregon.gov
        Nina.Englander@doj.oregon.gov
        Derek.Olson@doj.oregon.gov

Attorneys for Plaintiff, State of Oregon

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| NEWPORT FISHERMEN'S WIVES, INC., an Oregon nonprofit corporation, and LINCOLN COUNTY,  a political subdivision of the State of Oregon,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES COAST GUARD, an agency of the United States Department of Homeland Security, and KRISTI NOEM in her official capacity as the Secretary of Homeland Security,<br><br>        Defendants. | Case No. 6:25-cv-02165-AA (Leading Case)<br><br>MOTION FOR PRELIMINARY INJUNCTION<br><br>Consolidated with:<br>*State of Oregon v. Noem, et al.*<br>No. 6:25-cv-02172-AA (Trailing Case) |

MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ....................................................................................iii

LR 7-1 CERTIFICATION ......................................................................................... 1

MOTION.................................................................................................................... 1

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................. 2

     A.     Oregon's Coastal Waters Are Cold and Treacherous. ........................... 2

     B.     The Newport Coast Guard Air Facility (AIRFAC Newport) ................ 3

     C.     Congress Enacted Legislation to Protect AIRFAC Newport.................. 4

     D.     AIRFAC Newport's Operational Posture ............................................... 5

     E.     Despite the Procedural Protections of 14 U.S.C. § 912, Defendants
           Relocated AIRFAC Newport's Rescue Helicopter Without Providing
           Notice. ..................................................................................................... 6

     F.     Relocation of the Rescue Helicopter Harms Plaintiffs. .......................... 8

     G.     Plaintiffs Brought Actions to Enjoin Relocation of the Rescue Helicopter,
           and This Court Granted Relief................................................................ 11

IV.    ARGUMENT ................................................................................................. 12

     A.     This Court Has Jurisdiction Over This Action. .................................... 12

     B.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ......... 14

          1.     Defendants' Relocation of the Rescue Helicopter is Final Agency
                Action Subject to Review under the APA. ................................. 14

          2.     Defendants' Actions Violate 14 U.S.C. § 912. ......................... 17

          3.     Defendants' Actions Are Arbitrary and Capricious.................. 20

          4.     Defendants' Actions Are Contrary to the Coast Zone Management
                Act........................................................................................... 21

     C.     Plaintiffs Face Irreparable Harm Absent Preliminary Relief............... 23

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

D.      The Balance of the Equities and Public Interest Favor a Preliminary
        Injunction. .......................................................................................................... 24

V.      CONCLUSION .............................................................................................................. 25

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...................................................... 12

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ...................................................... 23

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................... 14

*Brotherhood of Locomotive Eng'rs v. Fed. R.R. Admin.*,
   972 F.3d 83 (D.C. Cir 2000) ...................................................... 15

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ...................................................... 12

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021) ...................................................... 20

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) ...................................................... 16

*Grand Canyon Trust v. Public Service Co.*,
   283 F. Supp. 2d 1249 (D.N.M. 2003) ...................................................... 15

*Indus. Cust. NW Util. V. Bonneville Power*,
   408 F.3d 638 (9th Cir. 2005) ...................................................... 16

*Krottner v. Starbucks Corp.*,
   628 F.3d 1139 (9th Cir. 2010) ...................................................... 13

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ...................................................... 25

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................... 13, 14

*Massachusetts v. Env't Prot. Agency*,
   549 U.S. 497 (2007) ...................................................... 13

*Michigan v. Env't Prot. Agency*,
   576 U.S. 743 (2015) ...................................................... 20

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010)................................................................................................ 12

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................................. 20

*Murthy v. Missouri,*
    603 U.S. 43 (2024)................................................................................................. 12

*Newport Fishermen's Wives, Inc. v. U.S. Coast Guard,*
    Civ. No. 6:14-cv-01890-MC, 2015 WL 1951751 (D. Or. Apr. 29, 2015)..................... 3, 4

*Nken v. Holder,*
    556 U.S. 418 (2009)......................................................................................... 12, 24

*Ohio v. Env't Prot. Agency,*
    603 U.S. 279 (2024)...............................................................................................20

*Or. Nat. Res. Council v. Harrell,*
    52 F.3d 1499, 1504 (9th Cir. 1995) .......................................................................15

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce,*
    128 F.4th 1089 (9th Cir. 2025) ......................................................................... 15, 16

*Pulsifer v. United States,*
    601 U.S. 124 (2024)........................................................................................ 18, 19

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ..................................................................... 24, 25

*Saliba v. U.S. Sec. & Exch. Comm'n,*
    47 F.4th 961 (9th Cir. 2022) ..................................................................................15

*S. Cal. Alliance of Publicly Owned Treatment Works v. EPA,*
    8 F.4th 831 (9th Cir. 2021) ................................................................................... 16

*Whitewater Draw Natural Resource v. Mayorkas,*
    5 F.4th 997 (2021)......................................................................................... 14, 15

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008).......................................................................................... 12, 23

*In re Zappos.com, Inc.,*
    888 F.3d 1020 (9th Cir. 2018) .......................................................................... 12, 13

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. III, § 2 ............................................................................................ 12

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

# STATUTES, RULES, AND REGULATIONS

5 U.S.C.

§ 704 ................................................................................................................. 14

§ 705 ................................................................................................................... 1

§ 706 .......................................................................................................... 19, 23

14 U.S.C. § 912 .................................................................................................... *passim*

16 U.S.C. § 1456(c) .................................................................................................. 22

Pub. L. No. 114-120, § 208(a), 130 Stat. 27 ........................................................ 4

Pub. L. No. 114-328, § 3503, 130 Stat. 2000 ...................................................... 4

Pub. L. No. 115-282, § 107(b), 132 Stat. 4192 ................................................... 4

15 C.F.R.

§ 930.11 ............................................................................................................... 22

§ 930.31 ............................................................................................................... 22

§ 930.32 ............................................................................................................... 22

§ 930.33 ............................................................................................................... 22

Fed. R. Civ. P. 65(a) ................................................................................................ 1

Or. Rev. Stat. § 196.425(1) .................................................................................. 22

# OTHER AUTHORITIES

Webster's Third New Int'l Dictionary (1993)

*Cessation* ........................................................................................................... 18

*Significant* ......................................................................................................... 18

*Terminate* .......................................................................................................... 19

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**LR 7-1 CERTIFICATION**

Counsel certifies that the parties conferred on this motion by videoconference on November 26 and in person on December 3 and were unable to resolve this dispute.

**MOTION**

On November 24, 2025, this Court entered a temporary restraining order that ordered Defendants to "immediately restore and maintain the status quo ante that has prevailed since 1987 by returning the rescue helicopter to the Coast Guard's Newport Air Facility, together with full operational capabilities, infrastructure and personnel support." ECF 15.

Plaintiffs now move for a preliminary injunction under Federal Rule of Civil Procedure 65(a) and for a stay of agency action under 5 U.S.C. § 705 to continue to preserve the status quo and enjoin Defendants from reducing the use of the Newport Coast Guard Air Facility ("AIRFAC Newport") by reassigning the rescue helicopter, infrastructure, and personnel support while these cases are pending before this Court. This motion is supported by the following memorandum of law and declarations filed in the consolidated cases.

## I.      INTRODUCTION

For nearly four decades, the rescue helicopter located at AIRFAC Newport has meant the difference between life and death on the central Oregon coast for hundreds of workers, residents, and visitors. Recognizing the importance of Coast Guard air facilities to Newport and other communities like it, Congress enacted statutes that prohibit the Coast Guard from closing or reducing operations at those facilities without notice, warning, and an opportunity for public comment and Congressional review. Nevertheless, Defendants ceased positioning a rescue helicopter at the Newport Air Facility without any effort to meet those statutory prerequisites. That means the nearest rescue helicopter is 70 miles away in North Bend, a distance that takes 34 minutes to travel by helicopter, which significantly increases the likelihood that an overboard mariner or a surfer swept to sea will suffer from hypothermia and die. To prevent such avoidable

Page 1 -    MOTION FOR PRELIMINARY INJUNCTION

tragedies, the State asks the Court to enjoin the reduction of rescue helicopter service from Newport.

 This Court has already ruled that Plaintiffs are likely to succeed on the merits of their claims when it granted Plaintiffs' motion for temporary restraining order (TRO). ECF 15. Plaintiffs now move this Court for a preliminary injunction that extends this Court's order while these cases are pending before this Court.

## II. BACKGROUND

### A. Oregon's Coastal Waters Are Cold and Treacherous.

 Oregon's coastal waters are cold and treacherous. "It is a rough and unforgiving environment." Decl. of Derek Olson ("Olson Decl.") Att. 8 ¶ 8 (Decl. of Ginny Goblirsch, 6:14-cv-01890) (ECF 7-8, 6:25-cv-02172). The challenging sea conditions of Oregon's central coast make fishing a dangerous occupation. Decl. of Rebecca Bostwick-Terry ("Bostwick-Terry Decl.") ¶ 7 (ECF 9); Decl. of Gary Ripka ("Ripka Decl.") ¶ 7 (ECF 12). "During crab season, sea conditions are at their most dangerous. Large swells and high winds make the bar crossings more dangerous."[1] Ripka Decl. ¶ 9. And Oregon's "ocean conditions result in terrible difficulties associated with a vessel or a first responder on a Surf Rescue Personal Watercraft being able to locate a person who has had the misfortune of entering the cold ocean waters." Decl. of Walter Chuck ("Chuck Decl.") ¶ 4 (ECF 13).

 Immersion in Oregon's coastal waters "creates immediate, life-threatening conditions that require rapid emergency response." Decl. of Dr. Leann Cyr, PhD ("Cyr Decl.") ¶ 4 (ECF 10); *see also* Decl. of Taunette Dixon ¶ 5 (ECF 11). Within three minutes, a cold shock response "causes involuntary gasping, hyperventilation, and can lead to drowning before hypothermia even begins." Cyr Decl. ¶ 5. Within ten minutes, a person loses "meaningful swimming ability and dexterity due to peripheral cooling." *Id.* Within an hour they lose "consciousness from hypothermia, leading to drowning." *Id.* And even those who are rescued can still be at risk of

---

[1] Dungeness Crab season is scheduled to start in December. Olson Decl. Att. 8 ¶ 25.

Page 2 - MOTION FOR PRELIMINARY INJUNCTION

death from "the point of rescue up to several hours afterwards." Olson Decl. Att. 8 ¶ 23. For those reasons, timely rescue can be the difference between life and death. Cyr Decl. ¶ 6 ("Every minute of delay exponentiality decreases survival probability."); Olson Decl. Att. 8 ¶ 26 ("for most people in Oregon's cold ocean waters, the window of opportunity to save lives is 10 to 45 minutes").

**B.  The Newport Coast Guard Air Facility (AIRFAC Newport)**

"The Coast Guard Air Facility located in Newport, Oregon (AIRFAC Newport), is a detachment of Air Station [AIRSTA] North Bend." *Newport Fishermen's Wives, Inc. v. U.S. Coast Guard (NFW I)*, Civ. No. 6:14-cv-01890-MC, 2015 WL 1951751, *1 (D. Or. Apr. 29, 2015); *see also* Olson Suppl. Decl. Att. 1 at 3. "AIRFAC Newport was established in 1987 following the tragic loss of the trawler Lasseigne and its three-person crew in November 1985." *Id*. (citing Decl. of Ginny Goblirsch, ECF 7). During that incident, the Lasseigne "was taking on water and the captain was able to radio a distress call to the Coast Guard." Olson Decl. Att. 8 ¶ 4. "The vessel sank quickly and all three members of the crew put on life jackets and jumped into the Pacific Ocean." *Id.* "Coast Guard helicopters were launched from both Astoria and North Bend, but did not reach the scene until one hour and fourteen minutes after the distress call." *Id.* "By then, the captain and one member of the crew had already died." *Id.* "A third crewman who appeared to be alive was rescued and flown to the hospital in Lincoln City where he died of hypothermia." *Id.*

That "tragic accident galvanized efforts by Newport Fishermen's Wives, Inc. and the greater Newport community to secure Coast Guard rescue helicopter capability for the central Oregon coast." *Id.* ¶ 5. "Because the Coast Guard's national two-hour response standard is simply inadequate in a cold water zone like the Pacific Ocean, the Coast Guard recognized the need for shorter response times in Oregon coastal waters and established" AIRFAC Newport. *Id.* In sum, "The AIRFAC Newport location was intended to facilitate [search and rescue] missions between Air Station Astoria, which is located 95 nautical miles to the north, and [AIRSTA]

Page 3 -    MOTION FOR PRELIMINARY INJUNCTION

North Bend, which is located approximately 70 miles to the south." *NFW I*, 2015 WL 1951751, at *1 (citing Decl. of Christopher Martino, ECF 19). To facilitate search and rescue missions, "AIRFAC Newport sustain[ed] a single MH-65 helicopter." *Id.*

### C. Congress Enacted Legislation to Protect AIRFAC Newport.

In 2013, the Coast Guard proposed closing AIRFAC Newport "in the President's Budget for Fiscal Year 2014." *NFW I*, 2015 WL 1951751 at *2 (citing Martino Decl.). In response, the Newport Fishermen's Wives, an Oregon non-profit organization, filed an action to enjoin the closure of AIRFAC Newport. Shortly thereafter, Congress passed the Coble Act, which prohibited the closure of AIRFAC Newport. *Id.* Following enactment of that Act, the court granted the Coast Guard's motion to dismiss Fishermen's Wives case as moot. *Id.* at *6.

In 2016, Congress enacted 14 U.S.C. § 676a, which it renumbered 14 U.S.C. § 912 in 2018. Pub. L. No. 114-120, § 208(a), 130 Stat. 27, Pub. L. No. 115-282, § 107(b), § 319, 132 Stat. 4192.[2] That statute provides four robust procedural protections to ensure that the Coast Guard does not take steps to "close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility" without community participation and notice to Congress. 14 U.S.C. § 912(a)(1)–(5) (detailing requirements that the Secretary must satisfy before closing Coast Guard Air Facilities).

Among other things, the statute prohibits the Secretary from closing, ceasing operations, or "any significant reduction in personnel and use of a Coast Guard air facility" before submitting a proposal to Congress and providing written notice of the proposal to several Congressional committees and members. *Id.* § 912(a)(4). In addition, the statute provides that the

---

[2] Although 14 U.S.C. § 912 has been amended twice since its predecessor statute was enacted in 2016, the substance of the statute has remained largely unchanged since 2016. Indeed, Congress added specificity and an additional procedural protection in 2018. *Compare* Pub. L. No. 114-120, § 208(a), 130 Stat. 27 (original enactment), *with* Pub. L. No. 114-328, § 3503, 130 Stat. 2000 ("corrections to provisions enacted by Coast Guard Authorization Acts"), and Pub. L. No. 115-282, § 107(b), § 319, 132 Stat. 4192 (updating dates, adding specificity to public meeting requirement, adding congressional review requirement (14 U.S.C. § 912(a)(5))).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Secretary "may not close, cease operations, or significantly reduce personnel and use" of the facility until 18 months *after* providing the required proposal to Congress. *Id.* § 912(a)(5).

**D. AIRFAC Newport's Operational Posture**

Coast Guard rescue helicopter crews generally operate in one of three operational postures. First, Bravo Zero ("B-0") status requires helicopter crews to be launch-ready within 30 minutes of a distress notification. Olson Suppl. Decl. Att. 3, Capt. Reinhold Dep. 18:6–11. Second, Bravo One ("B-1") requires helicopter crews to be launch-ready within one hour of a distress notification. *Id.* And third, Bravo Two ("B-2") requires helicopter crews to be launch-ready within two hours of a distress notification. *Id.* at 22:8–10.

In practice, helicopter crews in B-1 status commonly launch in far less time than an hour of receiving a distress notification. In Newport, the average launch time is "probably close to the 30-minute window." *Id.* at 24:16–18. By contrast, helicopter crews in B-0 "it's close to 30 minutes almost all the time," because "it takes about 15, 20 minutes just to spin the helicopter up and prepare it, go through all the systems," which only leaves "10 minutes of weather planning and crew planning before you've got to be in that helicopter." *Id.* at 24:23–25:5. For those reasons, "more often than not" rescue crews are "bumping up against that 30-minute window in Bravo Zero status." *Id.* at 25:6–7.

As of 2014, AIRFAC Newport did not house a helicopter rescue crew but did maintain the presence of one rescue helicopter and crew in a B-0 operational posture in 24-hour shifts:

> AIRFAC Newport is a sub-unit of [AIRSTA] North Bend, and AIRFAC Newport houses no permanent personnel. Rather, each day, the Coast Guard flies a MH-65 helicopter from [AIRSTA] North Bend to AIRFAC Newport. The helicopter has a crew of four: a pilot, copilot, flight mechanic, and rescue swimmer. Once at AIRFAC Newport, the MH-65 crew remains at Bravo Zero status for the next twenty four hours, whereby the crew is on standby to launch within thirty minutes of notification of a distress situation. At the conclusion of the twenty four hour shift, the MH-65 departs from [AIRSTA] North Bend and another helicopter and crew arrives to take their place.

Olson Decl. Att. 9 ¶ 4 (Decl. of Capt. Christopher Martino, *NFW I*) (ECF 7-8, *NFW II*).

Page 5 -    MOTION FOR PRELIMINARY INJUNCTION

The Coast Guard maintained that 24-hour B-0 operational posture until 2019, when it downgraded AIRFAC Newport's operational status to a 24-hour B-1 operational posture.[3] Olson Suppl. Decl. Att. 3 at 13:23–14:2. Then, in 2021, the Coast Guard further reduced AIRFAC Newport's search and rescue capabilities to only weekends and holidays between the months of April and September. *Id.* at 14:14–24; *see also* Suppl. Decl. Att. 1 at 12.  The Coast Guard continued that operational posture at AIRFAC Newport by providing a rescue helicopter to Newport only on weekends and holidays between April and September in 2022, 2023, and 2024. *Id.* at 16:5–9. Between the months of October and March from 2021 until 2024, the Coast Guard upgraded AIRFAC Newport's operational status to 24-hour B-0 coverage. *Id.* at 17:19–18:2. Accordingly, starting in 2021 and continuing through 2024, the Coast Guard did not stage a rescue helicopter at AIRFAC Newport during non-holiday weekdays during the summer months.

### E. Despite the Procedural Protections of 14 U.S.C. § 912, Defendants Relocated AIRFAC Newport's Rescue Helicopter Without Providing Notice.

Defendants relocated the AIRFAC Newport rescue helicopter without satisfying any of the procedural protections of 14 U.S.C. § 912.

On May 22, 2025, Coast Guard Captain Conley endorsed an April memorandum from Captain Bustamente, the commanding officer of AIRSTA North Bend, that requested authorization to discontinue the B-1 operational posture at AIRFAC Newport until September 30, 2025. Olson Suppl. Decl. Att. 4 at 1 (April Memorandum), *id.* at 2 (Conley's Memorandum) (acknowledging that the request constituted a "temporary reduction in staffing at Air Facility Newport"); *see also* Suppl. Att. 1 at 12; Att. 3 at 25:15–26:14, 76:12–17. Att. 4 at 1 (April Memorandum), *id.* at 2 (Conley's Memorandum) (acknowledging that the request constituted a "temporary reduction in staffing at Air Facility Newport"). Rear Admiral Fosse authorized that

---

[3] At Captain Reinhold's deposition, counsel for the State presented Captain Reinhold the declaration of Captain Martino from *NFW I*, which counsel marked as Deposition Exhibit 1. *See* Olson Suppl. Decl. Att. 3 at 9:14–10:2. That declaration is also Attachment 9 to the first Declaration of Derek Olson in this consolidated case. 6:25-cv-02172, ECF 7-9. Captain Reinhold confirmed that AIRFAC Newport remained in the operational posture reflected in paragraph 4 of Captain Martino's 2014 declaration until 2019. Olson Suppl. Decl. Att. 3 at 12:10–17.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

request. Olson Suppl. Decl. Att. 3 at 25:18–26:3; Att. 4 at 3 (Fosse's Memorandum).

Accordingly, starting on May 5, 2025, the Coast Guard ceased forward deploying a rescue

helicopter to AIRFAC Newport. Olson Suppl. Decl. Att. 1 at 12.

 An October 29 memorandum requested an extension of that authorization, which was

granted, extending the suspension of rescue helicopter operations from AIRFAC Newport

indefinitely. Olson Suppl. Decl. Att. 4 at 4; *see also id.*, Att. 1 at 12-13; Att. 3 at 70:22–71:9; Att.

4 at 4 (October Memorandum). By extending the suspension of rescue helicopter operations from

AIRFAC Newport, the Coast Guard was able to reassign "a helicopter and crew to Sector San

Diego in San Diego, California beginning on 18 November 2025" which was "used as an overt

presence to Control, Secure and Defend the Southwest Border." Olson Suppl. Decl. Att. 1 at 15.

In short, AIRFAC Newport's rescue helicopter was relocated to assist with immigration

enforcement. *See id.* ("While deployed to Sector San Diego, the AIRSTA North Bend MH-65E

was flying missions along the border, looking for anyone attempting to cross the border

illegally.").

 The Newport community became aware of the rescue helicopter's absence around the

beginning of November 2025. Ripka Decl. ¶ 5. Oregon's leaders sought information from the

Coast Guard, Olson Decl. Att. 1-2 (Letters from U.S. Senator Ron Wyden et al), and on

November 23, 2025, Coast Guard representative Commander Matthew Edes met with local

leaders, Decl. of Erin McMahon ¶ 4 (Case No. 6:25-cv-02172, ECF 12) ("McMahon Decl."). At

that meeting, Commander Edes "confirmed that the U.S. Coast Guard relocated the helicopter to

[AIRSTA] North Bend indefinitely due to staffing shortages" and the Coast Guard's assessment

that it "was capable of meeting the 2 hour search and response time" on the central coast using

"aircraft in North Bend and Astoria." *Id.* at ¶ 5. Commander Edes confirmed that there was no

current plan to return the rescue helicopter to Newport. *Id.* And Commander Edes made no

commitment to rotate additional personnel to Newport to ensure adequate staffing and facilitate

the return of the helicopter to Newport. *Id.* ¶ 4.

Page 7 -   MOTION FOR PRELIMINARY INJUNCTION

Defendants admit that they did not provide the requisite notice under 14 U.S.C. § 912 for a closure or reduction in use of a Coast Guard air facility. First, Defendants admit that the Secretary Noem did not make the factual determination under § 912(a)(2). Olson Suppl. Decl. Att. 2 at 3–4 (Defendants' Response to Plaintiffs' First Request for Admissions). Second, Defendants admit that Defendants did not provide public notice and an opportunity to comment under § 912(a)(3). *Id.* at 5–6. Third, Defendants admit that no proposal was submitted to Congress under § 912(a)(4). *Id.* at 6. And fourth, because Defendants have not yet provided a proposal and notice to Congress, the 18-month waiting period contemplated by § 912(a)(5) has not yet begun.

In sum, from May 5, 2025, until this Court ordered the helicopter's return to AIRFAC Newport, the Coast Guard did not station a rescue helicopter or its crew at AIRFAC Newport. And Defendants admit that they did not satisfy any of the procedural requirements of 14 U.S.C. § 912 before indefinitely ceasing search-and-rescue operations from AIRFAC Newport.

**F. Relocation of the Rescue Helicopter Harms Plaintiffs.**

Relocation of the rescue helicopter to North Bend from Newport harms the Plaintiffs.

Launching a rescue helicopter from AIRSTA North Bend to respond to an emergency in Newport instead of AIRFAC Newport adds an average of 30 minutes to response times. As Captain Reinhold testified, travel time from AIRSTA North Bend to AIRFAC Newport is roughly 35 minutes. Olson Suppl. Decl. Att. 3 at 33:2–5; *see also* Olson Suppl. Decl. Att. 1 at 11 ("The flight time for an MH-65 from AIRSTA North Bend to Newport is 34 minutes at 120 knots[.]"). The launch time for Coast Guard helicopter crews in a B-0 operational posture is "close to 30 minutes almost all the time." Olson Suppl. Decl. Att. 3 at 24:23–24. Thus, a rescue helicopter stationed at AIRSTA North Bend will arrive in about 65 minutes after receiving a distress notification. Similarly, the average launch time for a Coast Guard helicopter crew in B-1 status is roughly 30-40 minutes after receiving a distress notification. *See id.* at 24:2–3, 24:17–18 (launch time in B-1 status is "generally well before that hour expired" and on average "probably

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

close to the 30-minute window"). Accordingly, a rescue helicopter deploying from AIRFAC Newport, even in a B-1 operational posture, is capable of responding to a distress notification near Newport up to 35 minutes quicker, or in less than half the time of a rescue helicopter that is deployed from AIRSTA North Bend.

Rescue launches from AIRSTA North Bend meet "or exceed[ ] the 60-minute unconsciousness threshold" and eliminate "the margin of safety that has saved numerous lives over the past decades." Cyr Decl. ¶ 7. Unless it is returned, "The relocation of Newport's rescue helicopter will directly and predictably cost lives." Id. ¶ 13. As one former President of Newport Fishermen's Wives opined when the Coast Guard proposed closing AIRFAC Newport in 2014, "Because of the cold waters offshore year round off Oregon's central coast, if the Newport Air Station is decommissioned, what has been a viable search and rescue operation with the Newport rescue helicopter will become a body recovery operation accomplished by Coast Guard cutters or helicopters dispatched from Astoria or North Bend." Olson Decl. Att. 8 ¶ 21. Because Plaintiffs have members and employees who venture into Oregon's central coast on vessels and rely upon the rescue helicopter to ensure their health and safety, Defendants' decision to relocate the rescue helicopter to a distance that precludes timely rescue has created a substantial risk that Plaintiffs' members or employees will be injured or die because a rescue helicopter was not available to respond in time.

For example, Oregon Department of Fish and Wildlife (ODFW) and Oregon State Police (OSP) rely on AIRFAC Newport's rescue helicopter to ensure the health and safety of their employees and to assist in critically important research and law enforcement activities. Accordingly, the relocation of the rescue helicopter away from Newport harms those agencies.

ODFW manages its Marine Resources Program at Oregon State University's (OSU) Hatfield Marine Science Center in Newport. Decl. of Justin Ainsworth ("Ainsworth Decl.") ¶ 1. "Field research is a major component of the Marine Resources Program" and "ODFW staff routinely conduct field research at sea, in the estuary and along Newport's open rocky coast." Id.

Page 9 -   MOTION FOR PRELIMINARY INJUNCTION

¶ 3. "ODFW research teams are aboard vessels for single-day trips or prolonged trips up to seven days, commonly with 200 cumulative annual trips on ocean or estuary waters." *Id.* ¶ 4. "Field research at sea includes assessing and mapping marine habitats using remotely operated vehicles, conducting long-term monitoring of Oregon's marine reserve system through SCUBA and hook and line sampling, quantifying nearshore fish populations through integrated acoustic and visual survey methods, performing innovative research on commercial and recreational fishing gears, monitoring commercial and recreational fisheries through on-board observation, and assessing estuarine shellfish populations." *Id.* ¶ 3. "Data collected from ODFW's at-sea research informs resource management and policy decisions, including establishing sustainable fishing regulations, preserving nearshore ecosystems, and understanding potential impacts of coastal and offshore development projects like the placement of undersea cables and offshore wind energy." *Id*. "ODFW employees also conduct research along Newport's rocky coastline and cliffs and ride along on recreational vessels at sea." *Id.* ¶ 4.

"ODFW employees conduct field research year-round, including in the winter months when maritime conditions are often treacherous." *Id.* ¶ 5. Thus, "The rescue helicopter in Newport is an integral part of ODFW's safety planning and protocols for its employees that conduct field research." *Id.* ¶ 6. Namely, "ODFW relies on the helicopter for the safety of its employees that work at sea, in the estuary and along the coast." *Id.*

AIRFAC Newport's rescue helicopter "also advances ODFW's research." Ainsworth Decl. ¶ 8. "ODFW partners with researchers at OSU to conduct research on whale population distribution and its overlap with fisheries that can lead to whale entanglement." *Id.* And "ODFW and OSU researchers fly on the Newport helicopter to collect data for this research." *Id.* For all those reasons, AIRFAC Newport's rescue helicopter provides critical support to ODFW's work.

The Police Services Bureau is one of six bureaus of OSP. Decl. of Major Casey Thomas ("Thomas Decl.") ¶ 1. "One component of the Police Services Bureau is the Fish and Wildlife Division." *Id.* "The Fish and Wildlife Division's primary responsibility is to protect natural

Page 10 -  MOTION FOR PRELIMINARY INJUNCTION

resources by enforcing fish, wildlife and commercial fishing laws." *Id.* ¶ 2. "The Fish and Wildlife Division has a Marine Fisheries Team, comprised of seven trooper positions and one sergeant stationed along the coast of Oregon." *Id.* That "team focuses on state and federal fishery regulation enforcement." *Id.*

OSP's "largest vessel, the Guardian, is harbored in Newport." *Id.* ¶ 3. The Guardian "is OSP's only long-range ocean-going patrol vessel properly equipped to pull and inspect commercial fishing gear." *Id.* "The Guardian is used to ensure compliance with and enforce commercial and sport fishing regulations in the Pacific Ocean and coastal inland waters." *Id.* "The Marine Fisheries team and other troopers also use smaller vessels to patrol and to contact other watercraft in the Pacific Ocean." *Id.* ¶ 4.

Critically, "[i]f the Guardian or another OSP vessel was in distress, OSP would primarily rely on the U.S. Coast Guard for a rescue in an emergency situation." *Id.* ¶ 5. Thus, relocation of the AIRFAC Newport rescue helicopter presents the same danger to OSP Fish and Wildlife officers as it does to ODFW employees, Fishermen's Wives members, and constituents of Lincoln County.

Lastly, Defendants' relocation of the rescue helicopter without satisfying the requirements of 14 U.S.C. § 912 deprived Plaintiffs of notice of the helicopter's relocation, and an opportunity to be heard on the decision to move the helicopter.

### G. Plaintiffs Brought Actions to Enjoin Relocation of the Rescue Helicopter, and This Court Granted Relief.

To forestall the harms discussed above, Plaintiffs brought actions to enjoin relocation of the rescue helicopter. On November 24, 2025, this Court granted Plaintiffs' request for a TRO in Case No. 6:25-cv-02165 to maintain the status quo ante that prevailed before the rescue helicopter was relocated from AIRFAC Newport. Later, this Court granted Plaintiff State of Oregon's motion to consolidate Case No. 6:25-cv-02165 with Case No. 6:25-cv-02172. ECF 16.

Plaintiffs now respectfully request that this Court enter a preliminary injunction to continue that status quo ante while these cases are pending before this Court.

Page 11 -  MOTION FOR PRELIMINARY INJUNCTION

### III.    LEGAL STANDARD

A plaintiff seeking a preliminary injunction must satisfy four factors: (1) a likelihood of success on the merits, (2) likely irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the government is a party, courts consider the last two factors together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Ninth Circuit permits courts to balance the first and third factors, such that "serious questions going to the merits" in combination with a balance of hardships that tips sharply towards the plaintiff can satisfy those two factors, so long as the plaintiff shows that there is a likelihood of irreparable injury. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### IV.    ARGUMENT

As discussed below, Plaintiffs have satisfied the requirements for a preliminary injunction. Accordingly, this Court should enter an injunction that maintains the status quo ante that was established by this Court's TRO.

#### A.  This Court Has Jurisdiction Over This Action.

This Court has jurisdiction over this action. This Court's jurisdiction extends only to "Cases" or "Controversies." U.S. Const. art. III, § 2. A "case or controversy exists only when at least one plaintiff establishes that she has standing to sue." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation modified). "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir. 2018) (internal quotation marks omitted). For two reasons, Plaintiffs have standing to bring their claims.

Page 12 -  MOTION FOR PRELIMINARY INJUNCTION

First, Defendants' relocation of the rescue helicopter has created a "substantial risk" that Plaintiffs' members or employees will suffer significant injury or death if those members or employees are immersed in Oregon's coastal waters. The Ninth Circuit's data breach cases provide a useful analog. In *Krottner v. Starbucks Corp.*, the court concluded that an allegation of "increased risk of future identity theft" after a laptop containing plaintiffs' names, addresses, and social security numbers was stolen from their employer was sufficient to confer standing. 628 F.3d 1139, 1040–42 (9th Cir. 2010). The court explained that the plaintiffs had "alleged a credible threat of real and immediate harm stemming from the theft of a laptop containing their unencrypted personal data." *Id.* at 1143; *see also In re Zappos.com, Inc.*, 888 F.3d at 1023, 1026 (the plaintiffs alleged sufficient harm to confer standing where their "names, account numbers, passwords, email addresses, billing and shipping addresses, telephone numbers, and credit and debit card information" were hacked). Like those data breach cases, relocation of the only rescue helicopter that was capable of timely responding to emergencies has created a credible threat of real and immediate harm to Plaintiffs, their members, or their employees. *See* Cyr Decl. ¶ 13 ("The relocation of Newport's rescue helicopter will directly and predictably cost lives.").

Second, ceasing operations from AIRFAC Newport decreases tangible support for OSU and ODFW operations. Since 2020, the Coast Guard has flown an average 10 sorties each year for OSU whale survey flights out of AIRFAC Newport. *See* Olson Suppl. Decl. Att. 1 at 9. The Coast Guard also provides flights to ODFW from AIRFAC Newport by request. *Id.* at 9–10 Without a helicopter at AIRFAC Newport, that support will be curtailed.

Third, Plaintiffs have suffered a concrete and particularized procedural injury sufficient to establish standing. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n 7 (1992) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right

Page 13 -  MOTION FOR PRELIMINARY INJUNCTION

without meeting all the normal standards for redressability and immediacy."). Plaintiffs have a procedural right to publicly comment on the Secretary's proposal to close or cease operations at AIRFAC Newport, 14 U.S.C. § 912(a)(3)(A), and to the 18-month waiting period before Defendants close, cease operations, or significantly reduce personnel and use of AIRFAC Newport, § 912(a)(5). And because there is "some possibility" that Defendants will reconsider closing, ceasing operations, or significantly reducing personnel and use of AIRFAC Newport if Defendants are required to satisfy the procedural requirements of 14 U.S.C. § 912, which include providing the required determinations, § 912(a)(2), an opportunity for public comment, § 912(a)(3), notice to Congress, § 912(a)(4), and an 18-month waiting period to provide Congress an opportunity to act, § 912(a)(5), Plaintiffs have established that they have standing.

**B. Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

The State is likely to succeed on its claims that Defendants' actions are contrary to 14 U.S.C. § 912 and without observance of the procedures required by law, arbitrary and capricious, and contrary to the Coast Zone Management Act.

**1.     Defendants' Relocation of the Rescue Helicopter is Final Agency Action Subject to Review under the APA.**

Defendants' relocation of the AIRFAC Newport rescue helicopter and removal of associated infrastructure from Newport is final agency action subject to judicial review under the Administrative Procedure Act (APA).

APA review is limited to "final agency actions." 5 U.S.C. § 704. To constitute final agency action, the action must satisfy the two *Bennet* prongs: "First, the action must mark the consummation of the agency's decisionmaking process," *i.e.*, "it must not be of a merely tentative or interlocutory nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 178 (internal quotation marks omitted); *see also Whitewater Draw Natural Resource v. Mayorkas*, 5 F.4th 997, 1009 (2021) ("If 'consummation' addresses itself to '*final* agency action,' *Bennett*'s second

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

prong addresses itself to 'final agency *action.*'") (emphasis in original). Finality is "interpreted in a pragmatic and flexible manner," "focus[ing] on the practical and legal effects of the agency action." *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (quoting *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)). "The final agency action requirement is meant to prevent premature intrusion by courts into the agency's deliberations, not to insist that parties keep knocking at the agency's door when the agency has already made its position clear." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025) (citation modified). "Agency action generally need not be committed to writing to be final and judicially reviewable." *Brotherhood of Locomotive Eng'rs v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir 2000); *see also Grand Canyon Trust v. Public Service Co.*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) (rejecting party's position, which "would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing").

Defendants' actions satisfy both *Bennett* prongs. First, Defendants' actions constitute the consummation of their decision-making process. Two Coast Guard memoranda constitute final agency actions requiring the "cessation" or "significant reduction" in operations and use of the AIRFAC Newport.[4] The April 2025 memorandum from Captain Bustamente recommended suspension of B-1 status search and rescue operational status at AIRFAC Newport, which was authorized by Admiral Fosse. Olson Suppl. Decl. Att. 3 at 25:18–26:3, 76:9–78:25. The October 29, 2025 memorandum extended that operational posture to redeploy a helicopter from Oregon to the United States' Southern border. *Id.* at 71:3–9.

In addition, Commander Matthew Edes, a representative of the U.S. Coast Guard, has "confirmed that the U.S. Coast Guard relocated the [rescue] helicopter to North Bend indefinitely due to staffing shortages." McMahon Decl. ¶ 5; *see also* Olson Suppl. Decl. Att. 3 at 4 (¶ 4) (extending reassignment indefinitely "until sufficient aviation personnel are available").

---

[4] Plaintiffs have requested production of the memoranda. Olson Supp. Decl. Att. 3 at 143:18–25.

Page 15 -  MOTION FOR PRELIMINARY INJUNCTION

Each of these actions are Defendants' "last word," *i.e.*, the "endpoint" of their decision-making process regarding the rescue helicopter's permanent relocation. *See Or. Nat. Res. Council*, 465 F.3d at 984 (the court "look[s] to see whether the agency has rendered its last word on the matter to determine whether an action is final and is ripe for judicial review" (internal quotation marks omitted); *Prutehi Litekyan*, 128 F.4th at 1109 (the government's "decision marked an endpoint, not a starting point"); *cf. S. Cal. Alliance of Publicly Owned Treatment Works v. EPA*, 8 F.4th 831, 837 (9th Cir. 2021) ("agency action is not final when subsequent agency decision making is necessary to create any practical consequences"). For that reason, Defendants' conduct satisfies the first *Bennett* prong.

Second, legal consequences flow from Defendants' unannounced, indefinite relocation of the rescue helicopter. As noted above, Defendants relocated the rescue helicopter before satisfying the procedural requirements afforded by 14 U.S.C. § 912, which denied Plaintiffs the opportunity to challenge the relocation. *See Or. Nat. Res. Council*, 465 F.3d at 986–97 (to satisfy the second *Bennett* prong, the action must "impose an obligation, deny a right, or fix some legal relationship" (citation modified)). Also, the result of Defendants' decision-making process "is one that will directly affect the parties." *Indus. Cust. NW Util. V. Bonneville Power*, 408 F.3d 638, 646 (9th Cir. 2005) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)); *see also Or. Nat. Res. Council*, 465 F.3d at 982 ("In determining whether an agency's action is final," the court looks "to whether the action... has a direct and immediate effect on the day-to-day operations of the subject party" (internal quotation marks omitted)). As noted above, the State of Oregon will no longer be able to rely on the rescue helicopter to support marine research and law enforcement activities, which directly impacts safety planning and risks for ODFW and OSP's day-to-day operations. Ainsworth Decl. ¶ 8; Thomas Decl. ¶ 5. In addition, Lincoln County anticipates that relocation of the rescue helicopter "will place additional strain on the County's first responders." Chuck Decl. ¶ 6. For those reasons, Defendants' relocation of the helicopter satisfies *Bennett*'s second prong.

Page 16 -  MOTION FOR PRELIMINARY INJUNCTION

2.    **Defendants' Actions Violate 14 U.S.C. § 912.**

As noted above, 14 U.S.C. § 912 was enacted to ensure that the Coast Guard does not take steps to "close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility" without community participation and notice to Congress. That statute provides four procedural steps that must be completed before a Coast Guard air facility can be closed.

First, § 912(a)(2) provides that the Secretary may not propose closing or terminating operations at a Coast Guard air facility unless the Secretary determines that the area served by the air facility will not be harmed by the closure. Specifically:

> The Secretary may not propose closing or terminating operations at a Coast Guard air facility unless the Secretary determines that--
>
> (A) remaining search and rescue capabilities maintain the safety of the maritime public in the area of the air facility;
>
> (B) regional or local prevailing weather and marine conditions, including water temperatures or unusual tide and current conditions, do not require continued operation of the air facility; and
>
> (C) Coast Guard search and rescue standards related to search and response times are met.

Second, § 912(a)(3) provides that before closing an air facility the Secretary must provide opportunities for public comment, including public meetings:

> (A) In general.--Prior to closing an air facility, the Secretary shall provide opportunities for public comment, including the convening of public meetings in communities in the area of responsibility of the air facility with regard to the proposed closure or cessation of operations at the air facility.
>
> (B) Public meetings.--Prior to convening a public meeting under subparagraph (A), the Secretary shall notify each congressional office representing any portion of the area of responsibility of the air station that is the subject to such public meeting of the schedule and location of such public meeting.

Third, § 912(a)(4) provides that before "closure, cessation of operations, or any significant reduction in personnel and use of a Coast Guard air facility," the Secretary must submit a proposal to Congress, "along with the budget of the President submitted to Congress," and provide "not later than 7 days after the date a proposal for an air facility is submitted," written notice to the following Congressional members and committees:

Page 17 -  MOTION FOR PRELIMINARY INJUNCTION

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

(i) Each member of the House of Representatives who represents a district in which the air facility is located.

(ii) Each member of the Senate who represents a State in which the air facility is located.

(iii) Each member of the House of Representatives who represents a district in which assets of the air facility conduct search and rescue operations.

(iv) Each member of the Senate who represents a State in which assets of the air facility conduct search and rescue operations.

(v) The Committee on Appropriations of the House of Representatives.

(vi) The Committee on Transportation and Infrastructure of the House of Representatives.

(vii) The Committee on Appropriations of the Senate.

(viii) The Committee on Commerce, Science, and Transportation of the Senate.

As recounted above, Defendants have failed to satisfy *any* of those four procedural requirements before reassigning the AIRFAC Newport rescue helicopter to North Bend. Captain Conley's May memorandum acknowledged that authorizing Captain Bustamente's request to reassign the AIRFAC Newport rescue helicopter would result in a "temporary reduction in staffing at Air Facility Newport." Olson Suppl. Decl. Att. 4 at 2. And Giard's October memorandum extended the reassignment of AIRFAC Newport's rescue helicopter indefinitely. Olson Suppl. Decl. Att. 4 at 4.

For those reasons, the reassignment constituted a cessation of operations and significant reduction in the personnel and use of AIRFAC Newport. *See Webster's Third New Int'l Dictionary* 367, 2116 (1993) (defining "cessation" as a "*temporary* or final ceasing or discontinuance" and "significant" as "having or likely to have influence or effect" *i.e.*, "NOTABLE" (emphasis added). Section 912(a)(2) uses the phrase "cessation"—as distinct from "terminating operations"—demonstrating that even a temporary suspension of operations at an air facility triggers the procedural protections of § 912(a)(3)–(5). *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and

Page 18 -  MOTION FOR PRELIMINARY INJUNCTION

different terms usually have different meanings." (citing A. Scalia & B. Garner, *Reading Law* 170–71 (2012)); *see also Webster's* at 2359 (defining "terminate" as "to end formally and definitely"). Accordingly, because Defendants reassigned AIRFAC Newport's only rescue helicopter for a period of nearly 7 months, Defendants ceased operations or significantly reduced the use of AIRFAC Newport without satisfying the requirements of 14 U.S.C. § 912(a)(4) or (a)(5), and Plaintiffs have thus demonstrated a likelihood of success on its claims that Defendants actions are contrary to § 912. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law").

Also, because Defendants failed to follow the procedural steps required by § 912(a)(4), Plaintiffs have demonstrated a likelihood of success on the merits of their claim that Defendants' actions are "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

The State anticipates that Defendants will assert that their relocation of the rescue helicopter constituted a "reasonable management efficienc[y]." *See* 14 U.S.C. § 912(b) ("The Secretary may implement any reasonable management efficiencies within the air station and air facility network, such as modifying the operational posture of units or reallocating resources as necessary to ensure the safety of the maritime public nationwide."). But as this Court has explained, although "some operational flexibility is afforded to the Secretary under § 912(b)," that "operation flexibility does not, by the plain terms of § 912(a), extend to decisions which close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility." ECF 15 at 10. In addition, by the Coast Guard's own admission, it relocated the Newport helicopter not to "ensure the safety of the maritime public nationwide," as permitted under § 912(b), but instead to pursue the Administration's separate immigration policy objectives. Because Defendants significantly reduced personnel and use of AIRFAC Newport by reassigning the rescue helicopter in May 2025 pursuant to the April memorandum, and then again by relocating that rescue helicopter to shift Coast Guard assets from search and rescue

Page 19 -  MOTION FOR PRELIMINARY INJUNCTION

operations in Oregon to immigration enforcement in California pursuant to the October memorandum, Defendants' actions are contrary to 14 U.S.C. § 912.

**3.    Defendants' Actions Are Arbitrary and Capricious.**

Plaintiffs have also demonstrated a likelihood of success on their claim that Defendants' actions are arbitrary and capricious because Defendants have failed to provide a reasoned explanation for their decision to relocate the rescue helicopter. *See Ohio v. E.P.A.*, 603 U.S. 279, 292 (2024) (Agency action is arbitrary and capricious when the agency has failed to provide "a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.") (citation modified).

To survive arbitrary-and-capricious review, agency actions must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While a court may not "substitute its own policy judgment for that of the agency," *id.*, it must ensure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation modified). The APA requires agencies to "pay[] attention to the advantages *and* the disadvantages" of their decisions. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015) (emphasis in original).

Defendants' actions are arbitrary and capricious for four reasons, each of which demonstrate that there is no rational connection between the facts in the record and Defendants' decision to relocate the rescue helicopter.

First, although Defendants assert that the response times are functionally equivalent between a rescue helicopter in B-1 operational posture at AIRFAC Newport and a rescue helicopter in B-0 operational posture at AIRSTA North Bend, as discussed above, the average response time from AIRFAC Newport in B-1 posture is 25–30 minutes faster than the response time from AIRSTA North Bend.

Page 20 -  MOTION FOR PRELIMINARY INJUNCTION

Second, Defendants' argument relies on admission of an additional significant reduction in AIRFAC Newport's personnel and use. As noted above, in 2018 AIRFAC Newport's operational posture was B-0. Accordingly, when the Coast Guard later downgraded AIRFAC Newport's operational posture to B-1, that represented its own significant reduction in AIRFAC Newport's use. Defendants now rely on that initial reduction in use to argue that the response times between AIRSTA North Bend (which is in a B-0 posture) and AIRFAC Newport (which is in a B-1 posture) are functionally equivalent. But Defendants cannot rely on one unlawful reduction in use to justify further unlawful reductions in use.

Third, because 14 U.S.C. § 912 requires that the use of Coast Guard Air Facilities that existed at the time of enactment (in the case of AIRFAC Newport, search and rescue) continue absent meeting the statutory procedural requirements, Defendants decision to significantly reduce the personnel and use of AIRFAC Newport to use the relocated assets for a *new* purpose has no rational connection to the purpose of the statute. Even "reasonable management efficiencies" may only be implemented "as necessary to ensure the safety of the maritime public nationwide"—not to increase enforcement of immigration controls, as the Coast Guard has done here.

And fourth, Defendants argument that the Coast Guard can maintain a two-hour rescue response to the Newport-area from AIRSTA North Bend ignores that two hours of immersion in Oregon's cold coastal waters carries a significant risk of death.

For those reasons, the State has demonstrated a likelihood of success on the merits of its claim that Defendants' decision to relocate the AIRFAC Newport rescue helicopter was arbitrary and capricious.

### 4.    Defendants' Actions Are Contrary to the Coast Zone Management Act.

Relocation of the rescue helicopter away from AIRFAC Newport will have a reasonably foreseeable effect on coastal uses, including navigation, fishing, and recreation, resulting from the loss of this local search and rescue resource. Because Defendants admit that they failed to

Page 21 -  MOTION FOR PRELIMINARY INJUNCTION

provide a consistency determination, Olson Suppl. Decl. Att. 2 at 7, and because they have not sought a consistency review, that relocation of the AIRFAC Newport rescue helicopter is consistent to the maximum extent practicable with federally approved enforceable policies of Oregon's coastal management program, Defendants' relocation of the rescue helicopter violates the Coast Zone Management Act (CZMA).

The CZMA provides that federal agency actions that affect any use or resource of the state's coastal zone must be consistent to the maximum extent practicable with the federally approved enforceable polices of a state's coastal management program. 16 U.S.C. § 1456(c). A "federal agency activity" is "any function performed by or on behalf of a Federal agency in the exercise of is statutory responsibilities." 15 C.F.R. § 930.31.

A federal agency carrying out an activity in a coastal zone is required to provide the state with a consistency determination at the earliest practicable time in the planning or reassessment of the activity, and in no case later than 90 days before the final approval of the activity unless the federal agency and state agree to an alternative notification schedule. 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.36(b). That determination includes whether an action has reasonably foreseeable direct and indirect effects on any coastal use or resource. 15 C.F.R. § 930.33. An "effect on any coastal use or resource" means "any reasonably foreseeable effect on any coastal use" resulting from a federal action and include direct and indirect effects which result from the activity and later in time. 15 C.F.R. § 930.11(g). Coastal uses include recreation and fishing. 15 C.F.R. § 930.11(b). And federal agencies are required to consider the enforceable polices of a management program "as requirements to be adhered to in addition to existing Federal agency statutory mandates." 15 C.F.R. § 930.32(2).

The U.S. Secretary of Commerce approved the Oregon Coastal Management Program on July 7, 1977. Or. Rev. Stat. § 196.425(1). Oregon's Statewide Planning Goal 19, "Ocean Resources" is an enforceable policy of the Oregon Coastal Management Program. Goal 19 provides in part "State and federal agencies shall carry out actions that are reasonably likely to

Page 22 -  MOTION FOR PRELIMINARY INJUNCTION

affect ocean resources and uses of the Oregon territorial sea in such a manner as to . . . protect and encourage the beneficial uses of ocean resources – such as navigation, food production, [and] recreation." Olson Suppl. Decl. Att. 5 at 2.

Because relocation of the rescue helicopter away from AIRFAC Newport will have a reasonably foreseeable effect on coastal uses, including navigation, fishing, and recreation, resulting from the loss of this local search and rescue resource, Defendants are required to provide a consistency determination and obtain a consistency review that relocation of the AIRFAC Newport rescue helicopter is consistent to the maximum extent practicable with federally approved enforceable policies of Oregon's coastal management program. Having failed to do so, Defendants have violated the CZMA. And, in any case, because the relocation of the rescue helicopter is not consistent to the maximum extent practicable with the federally approved enforceable policies of a state's coastal management program, that action was not consistent with the CZMA. For those reasons, Plaintiffs are likely to succeed on their claim that relocation of the rescue helicopter is contrary to the CZMA. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall...hold unlawful and set aside agency action, findings, and conclusions found to be... not in accordance with law").

### C. Plaintiffs Face Irreparable Harm Absent Preliminary Relief.

This Court should enter a preliminary injunction because Plaintiffs face a likelihood of irreparable harm absent injunctive relief. *See Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (Emphasis in original); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (harm is irreparable where "there is no adequate legal remedy, such as an award of damages"). As discussed above, Plaintiffs are suffering ongoing and imminent injuries based on Defendants' conduct. Each of those injuries is irreparable. Two of those injuries are briefly summarized below.

Page 23 -  MOTION FOR PRELIMINARY INJUNCTION

First, absent injunctive relief, Plaintiffs are suffering irreparable harm because their members, employees, and constituents rely on the rescue helicopter to ensure their safety. For example, ODFW has lost access to the AIRFAC Newport rescue helicopter, which was "an integral part of ODFW's safety planning and protocols for its employees that conduct field research" and on which ODFW relied "for the safety of its employees that work at sea, in the estuary, and along the coast." Ainsworth Decl. ¶ 6. "The delayed response time caused by relocating the Newport helicopter to North Bend increases safety risks for ODFW employees" because each "minute matters when there is an emergency in the ocean or along the coast." *Id.* ¶ 7. And OSP "primarily rel[ies] on the U.S. Coast Guard for a rescue in an emergency situation." Thomas Decl. ¶ 5.

Second, absent injunctive relief, Plaintiff State of Oregon has lost an important tool in marine research. "ODFW and OSU researchers fly on the Newport helicopter to collect data for this research." *Id.* ¶ 8. That research includes "whale population distribution and its overlap with fisheries that can lead to whale entanglement." *Id.* "The relocation of the rescue helicopter to North Bend makes this research more difficult to conduct." *Id.*

For those reasons, Plaintiffs will suffer irreparable harm absent injunctive relief.

**D. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.**

This Court should enter a preliminary injunction because the balance of equities and the public interest weigh in favor of injunctive relief. Those "factors merge" when the government is the party to be enjoined. *Nken*, 556 U.S. at 435.

The balance of equities tips sharply in the State's favor. The State seeks the return of the AIRFAC Newport rescue helicopter to ensure the health and safety of ODFW and OSP personnel who rely on that helicopter when they conduct marine research and law enforcement activities on the central Oregon coast, and to further vital marine research.

In contrast, the federal government faces no harm from an injunction. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or

Page 24 -  MOTION FOR PRELIMINARY INJUNCTION

reads a statute as required to avoid constitutional concerns." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191(D.D.C. 2015); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (although "[t]here is generally no public interest in the perpetuation of unlawful agency action," "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operation" (internal quotation marks omitted)). Defendants have unlawfully removed the AIRFAC Newport rescue helicopter. Neither the balance of equities nor public interest weigh against enjoining that unlawful action.

## V.    CONCLUSION

For the forgoing reasons, this Court should issue a preliminary injunction.


DATED December 4, 2025.

Respectfully submitted,

DAN RAYFIELD
Attorney General


*s/ Derek Olson*
BRIAN SIMMONDS MARSHALL #196129
NINA ENGLANDER #106119
Senior Assistants Attorney General
DEREK OLSON #225504
Assistant Attorney General
Trial Attorneys
Tel 9716731880
Fax 9716735000
Brian.S.Marshall@doj.oregon.gov
Nina.Englander@doj.oregon.gov
Derek.Olson@doj.oregon.gov
Of Attorneys for the State of Oregon


Page 25 -  MOTION FOR PRELIMINARY INJUNCTION