**SCOTT E. BRADFORD, OSB #062824**
United States Attorney
District of Oregon
**SUSANNE LUSE, OSB # 142489**
Assistant United States Attorney
Susanne.Luse@usdoj.gov
1000 SW Third Ave., Suite 600
Portland, Oregon 97204-2936
Telephone:     (503) 727-1000
Facsimile:     (503) 727-1117
          Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| **NEWPORT FISHERMEN'S WIVES;** **LINCOLN COUNTY,** | Case No. 6:25-cv-02165-AA (Lead) Case No. 6:25-cv-02172-AA (Trailing) |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **UNITED STATES COAST GUARD;** **KRISTI NOEM,** | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................1

BACKGROUND ..............................................................................................................3

I.      OPERATIONS AT AIR FACILITY NEWPORT ................................................3

II.     14 U.S.C. § 912 Air Facility Closures ...............................................................7

LEGAL STANDARDS ....................................................................................................8

ARGUMENT ...................................................................................................................9

Plaintiffs Are Unlikely to Succeed on the Merits ..........................................................9

I.      14 U.S.C. § 912 Provides No Private Cause of Action ......................................9

        A.      Plaintiffs Lack Article III Standing ........................................................10

        B.      There is No Final Agency Action Pursuant to the APA ...........................14

        C.      The Coast Guard's Operational Decisions are Authorized by 14 U.S.C. § 912(b) .....19

        D.      The Coast Guard's Operational Decisions are Not Arbitrary and Capricious............20

        E.      The Modifications to AIRFAC Newport's Operational Posture Do Not Implicate
                the CZMA ...............................................................................................24

II.     Plaintiffs fail to demonstrate a likelihood of irreparable harm that favors a
        preliminary injunction..............................................................................28

III.    The Balance of Equities and Public Interest Disfavor a Preliminary Injunction ..............29

IV.     Plaintiffs Must Post a Bond .............................................................................30

CONCLUSION...............................................................................................................31

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) .......................... 9

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 9

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................... 11

*Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024 (9th Cir. 2024) ............................... 9

*Bennet v. Spear*, 520 U.S. ....................................................... 13, 14, 17

*Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668 (9th Cir. 1988) ...................... 28

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................... 11

*Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084 (9th Cir. 2014) ............................. 18

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ................................... 11

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850 (9th Cir. 2022) ....................... 24

*Fang v. United States*, 140 F.3d 1238 (9th Cir. 1998) ................................... 13

*Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658 (D.D.C. 1996) ........................... 13

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ................................... 11

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) ..................................... 9

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) ........................... 11

*Korpi v. United States*, 961 F.Supp. 1335 (N.D. Cal. 1997) .......................... 13

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................... 11

*Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 5 F.4th 952 (9th Cir. 2021) ..... 10

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..................................... 11, 12

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873 (9th Cir. 2009) ..................................................... 8, 28

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) .......................... 11

*Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) .............................................................. 20

*Munaf v. Geren*, 553 U.S. 674 (2008) ...................................................................................... 8

*N.A.A.C.P. v. Sec'y of HUD*, 817 F.2d 149 (1st Cir. 1987) ..................................................... 10

*New York v. U.S. Gen. Servs. Admin.*, 823 F. Supp. 82 (N.D.N.Y. 1993) .................................. 27

*Northwest Center for Alternatives to Pesticides v. U.S. Department of Homeland Security*, 552 F.Supp.3d 1078 (2021) ................................................................................................. 17

*Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977 (2006) ................................. 17

*San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005) ................................... 10

*San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996) ............................... 13

*San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564 (9th Cir. 2019) ................... 17

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ............................................................................ 12

*Solis v. Saenz*, 60 Fed. App'x 117 (9th Cir. 2003) .................................................................... 26

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994) ........................................................ 8, 9

*Summers v. Earth Island*, 555 U.S. 488 (2009) ....................................................................... 12

*Transwestern Pipeline Co., LLC v. 17.19 Acres*, 627 F.3d 1268 (9th Cir. 2010) ........................ 25

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937 (9th Cir. 2006) ........... 16

*UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695 (9th Cir. 2018) ................................. 10

*Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261 (9th Cir. 1990) ............................................... 17

*United States v. Flores*, 729 F.3d 910 (9th Cir. 2013) ............................................................. 25

*United States v. Lillard*, 935 F.3d 827 (9th Cir. 2019) ............................................................. 25

*Univ. of Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096 (9th Cir. 1999) ............................. 29

*Warth v. Seldin*, 422 U.S. 490 (1975) ...................................................................................... 12

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............................................. 9, 28, 29

*Woodyer v. United States*, 334 F.Supp.2d 1263 (W.D. Wash. 2004) ........................................... 13

## FEDERAL STATUTES

6 U.S.C. § 488 ............................................................................................................................ 1

14 U.S.C. § 912 ................................................................................. 1, 3, 7, 9, 10, 19, 22

14 U.S.C. § 912(a) ..................................................................................................... 20

14 U.S.C. § 912(b) ................................................................ 2, 8, 15, 18, 19, 20

14 USC 701(a) .............................................................................................................. 22

16 U.S.C. § 1452 ......................................................................................................... 24

16 U.S.C. § 1455 ......................................................................................................... 24

16 U.S.C. § 1456(c)(1)(A) .......................................................................... 24, 26, 27

16 U.S.C. § 1456(c)(1)(C) ......................................................................................... 24

28 U.S.C. § 2401(a) .................................................................................................... 16

28 U.S.C. § 2671 ......................................................................................................... 13

40 U.S.C. § 1315 ......................................................................................................... 17

## FEDERAL RULES

Fed. R. Civ. P. 65(c) ................................................................................................... 30

## FEDERAL REGULATIONS

15 C.F.R. § 930.31(a) ................................................................................. 24, 25, 26

15 C.F.R. § 930.33(a)(1) ............................................................................................ 27

15 C.F.R. § 930.33(a)(2) ............................................................................................ 27

15 C.F.R. § 930.34(a)(1) ...................................................................................... 24, 25

Plaintiffs are not entitled to a preliminary injunction because the status quo they seek to maintain is not changing in any immediate sense. The U.S. Coast Guard will staff Air Facility ("AIRFAC") Newport through spring 2026 as it did last year, at which point it will assess its resources for the summer season as it has for the past several years.  See Declaration of Captain Kent Reinhold ("Reinhold Decl.") ¶ 31. Plaintiffs were informed of this fact but decided to move for emergency relief anyway.  Further, even if AIRFAC Newport was not in use, the Coast Guard has found that AIRFAC Newport's search and rescue coverage is redundant of that of Air Stations ("AIRSTA") North Bend and Astoria.  Reinhold Decl. ¶ 22. The lack of imminent, irreparable harm is reason alone to deny Plaintiffs' motion.  Additionally, Plaintiffs are not likely to succeed on the merits of their claims.  The Court lacks jurisdiction because Plaintiffs have not identified a final agency action, 14 U.S.C. § 912 does not contain a private right of action, and the Coast Guard's staffing decisions do not implicate the Coastal Zone Management Act ("CZMA").  Finally, the balance of harms and public interest weigh in favor of permitting the Coast Guard—not one interest or State—to decide how to manage the Coast Guard's limited resources to best accomplish its many missions along the West Coast and across the country.

## INTRODUCTION

The Coast Guard has eleven statutory missions performed by personnel and assets stationed throughout the continental United States, Alaska, Hawaii, and locations throughout the world including Europe, Bahrain, Guam, Singapore, and Japan.[1]  6 U.S.C. § 488.  The missions range from defense readiness (Coast Guard members serve in nine United States Combatant Commands) to law enforcement to search and rescue and the Coast Guard's multi-mission helicopters (the MH in MH-65 stands for Multi-Mission Helicopter) support almost all of them.  Reinhold Decl. ¶3.

---

[1] https://www.uscg.mil/About/Force-Laydown/

Coast Guard helicopters, however, are a scarce resource which the Coast Guard must constantly adjust and reassess how they are employed.  While this case may appear to implicate just one helicopter using one air facility, it impacts the operational readiness of the parent unit, AIRSTA North Bend, as well as the Coast Guard's ability to meet its mission requirements across Coast Guard Northwest District and the Pacific Area. Reinhold Decl. ¶¶ 6, 10-11, 19.

Consistent with this need to allocate its scarce resources, the Coast Guard has changed how it uses AIRFAC Newport in several ways since 2019 and through this year.  These changes are consistent with Congress' authorization to "implement any reasonable management efficiencies within the air station and air facility network, such as modifying the operational posture of units or reallocating resources as necessary to ensure the safety of the maritime public nationwide." 14 U.S.C. § 912(b).  Because AIRFAC Newport provides redundant search and rescue coverage to the larger air stations located in North Bend and Astoria, none of these modifications of its operational posture interfere with the Coast Guard's ability to respond to mariners or other members of the public in distress. Since AIRFAC Newport was established improvements in communications, technology and additional resources (such as small boat capabilities out of Yaquina Bay and Depoe Bay) have significantly improved SAR operations along the Oregon coast. Reinhold Decl. ¶¶ 12-17; see also Deposition of Kent Reinhold ("Reinhold Dep.") 33:12-34:2.

The Coast Guard's employment of Congressionally authorized operational flexibility across its air station and air facility network within Oregon is not an action expected to have any "reasonably foreseeable effect on any coastal use or resource" and therefore does not violate the Coastal Zone Management Act of 1972.

Finally, the temporary reallocation of resources involving AIRFAC Newport is not a

"significant reduction in personnel and use of" the air facility at Newport and therefore does not implicate any notice or comment requirements under 14 U.S.C. § 912.

## BACKGROUND

### I. OPERATIONS AT AIR FACILITY NEWPORT

The Coast Guard's Air Facility ("AIRFAC") in Newport, Oregon was established in 1987 as the base of operations for a single Coast Guard helicopter to operate primarily in Search and Rescue ("SAR") efforts near the Oregon coastline. Reinhold Decl. ¶ 4. AIRFAC Newport lies between the far larger Air Stations in Astoria and North Bend, which each house multiple helicopters along with more support personnel. To be precise, AIRFAC Newport is 95 nautical miles to the south of AIRSTA Astoria, and 70 miles to the north of AIRSTA North Bend. Id. ¶ 5. AIRFAC Newport is a sub-unit of AIRSTA North Bend, and AIRFAC Newport houses no permanently assigned helicopter and no permanently assigned air crew. Since 2018, one aviation rated petty officer's assigned duty is at the AIRFAC and that petty officer has the job title of Station Keeper. The Station Keeper maintains the fuel farm at the AIRFAC and assists the aircrew when a helicopter is at the AIRFAC. Id. ¶ 6.

When AIRFAC Newport is in use, the Coast Guard flies an MH-65 helicopter from AIRSTA North Bend to AIRFAC Newport. The helicopter has a crew of four: a pilot, copilot, flight mechanic, and rescue swimmer. Once at AIRFAC Newport, the MH-65 crew remains at a readiness status for their entire time there. Id. ¶ 7. If the helicopter and the crew are at B-0 status the crew is on standby to launch within thirty minutes of notification of a distress situation. If the helicopter and the crew are at B-1 status the crew is on standby to launch within one hour of notification of a distress situation. An aircrew can only remain at a B-0 status for 24 hours. This limitation is to ensure the aircrew can safely operate the helicopter.

A B-1 status can be maintained safely by a single crew for multiple days in a row. When AIRFAC Newport is maintained with a B-0 readiness status, at the conclusion of each 24-hour period, the MH-65 departs from AIRFAC Newport to return to AIRSTA North Bend and another helicopter and crew from AIRSTA North Bend arrives to take their place. When AIRFAC Newport is maintained at a B-1 readiness status, the crew remains at AIRFAC Newport for multiple days in a row. Typically, the crew arrives on Friday and remains until Tuesday. On Tuesday, the MH-65 and crew departs from AIRFAC Newport and returns to AIRSTA North Bend and another helicopter and crew from AIRSTA North Bend arrives to take their place. Id. ¶ 8-9.

In 2014 when the earlier lawsuit was filed, AIRSTA North Bend flew an MH-65 helicopter to AIRFAC Newport daily in order to maintain a B-0 readiness status year-round. As stated previously, shuttling helicopters back and forth every day consumed the majority of a full year's worth of flight hours for one helicopter. This also reduced the opportunities for conducting maintenance because all maintenance is done at AIRSTA North Bend and two of the station's five helicopters were shuttling back and forth every day with another in a B-0 readiness status at AIRSTA North Bend. Id. ¶ 25.

On 21 August 2019, in order to improve maintenance and operational readiness, AIRSTA North Bend requested and received permission to switch the readiness status of the AIRFAC Newport from B-0 to B-1, meaning the helicopter and aircrew would spend more than a 24-hour period in Newport before rotating. This cut the number of flight hours spent on transit flights in half and therefore increasing the time between maintenance and the life of

the helicopter.[2] Id.

AIRFAC Newport operated at a B-1 readiness status every day until 24 April 2021. From that day until 09 September 2021, AIRFAC Newport operated on weekends due to a transition to the newer MH-65E helicopter model (requiring additional training and turnover), as well as fleet sustainment issues.  Reinhold Decl. ¶ 26. The following year, AIRFAC Newport operated on the weekends only from 01 June through 02 October 2022, because of insufficient qualified air crew. Id.

Summers are a difficult time of year for fully manning all types of Coast Guard units, and particularly so for air stations.  Coast Guard service members typically serve tours of duty in a particular job for periods of two to four years and then are transferred to a new job.  Each summer, about one-third of all Coast Guard military members transfer to a new job.  In addition to finding new housing, perhaps schools for children and a job for a spouse, members often must spend time training and qualifying for their new job.  For a brand-new aviator who has just completed flight school, this process can take a full year.  Even an experienced aircraft commander needs to qualify at a new air station including conducting area familiarization flights so the first time the pilot flies to an area is not under the stress of conducting a rescue at night with driving rain and high winds.  Enlisted personnel serving as rescue swimmers and flight mechanics also must undergo new training and qualifications at each duty station.  The process of conducting that training and qualifying new personnel is more efficient when all personnel are at North Bend rather than always having an aircrew in Newport. Id. ¶ 27.

---

[2] Oregon incorrectly states Captain Reinhold testified Newport's operational status was upgraded to 24-hour B-0 coverage between the months of October and March from 2021 to 2024. ECF 42 at 6.

For 2023 and 2024, as permitted under their operational flexibility, AIRSTA North Bend requested and received permission to increase the operational readiness posture at AIRFAC Newport to weekends and holidays from May through September. The remainder of the year AIRFAC Newport was operational every day with occasional exceptions due to weather issues, maintenance or repair of helicopters, crew availability, or deployments. For example, in the summer of 2023, AIRSTA North Bend was required to deploy a helicopter aboard Coast Guard Cutter ALERT for a living marine fisheries patrol. Reinhold Decl. ¶ 28. Coast Guard cutters do not have permanently assigned helicopters so when one is needed a helicopter is deployed from an air station, reducing that air station's available helicopters and personnel. Id.

AIRFAC Newport began 2025 in a B-1 readiness status. AIRSTA North Bend was authorized to reduce operations at AIRFAC Newport from 05 May 2025, through 30 September 2025, because of a lack of qualified aircraft commanders and limitations in other qualified aircrew and mission capable helicopters. As described in the previous paragraph, training and qualification of aviation personnel are more effectively accomplished when all aviation personnel are located at North Bend. During this period, no helicopter was sitting in a B-1 readiness status at AIRFAC Newport. However, AIRSTA North Bend helicopters continued to use AIRFAC Newport. Helicopter crews would use AIRFAC Newport weekly to train with the crews at Motorlife Boat Stations Yaquina Bay and Depoe Bay, and helicopter crews would remain overnight at AIRSTA Newport in a B-1 readiness status as available to increase mission execution efficiencies and training opportunities. Id. ¶ 29.

By maintaining all helicopters and assigned personnel at AIRSTA North Bend, the air

station was able to maintain its B-0 readiness status at the air station while enabling the air station to focus on preserving future readiness through training and development. That effort was successful in reducing staffing issues by the fall, but the deployment of a helicopter and personnel to fill a shortage at AIRSTA San Diego prevented AIRSTA North Bend from resuming a B-1 readiness status at AIRFAC Newport. That deployment was scheduled to end by mid-December 2025, in time for the opening of Dungeness crab season. Reinhold Decl. ¶ 30. The Coast Guard currently is rotating helicopters and air crews through AIRFAC Newport to maintain a B-1 status. The Coast Guard intends to maintain that status through spring 2026 as it has since 2021. As it has for the past five years, AIRSTA North Bend will assess its readiness posture for the summer 2026 transfer season and may request permission to consolidate its resources at AIRSTA North Bend to optimize operational readiness through the summer months and across the entire year by focusing on training and development of new personnel. Id. ¶ 30.

## II.    14 U.S.C. § 912 Air Facility Closures

Because any SAR coverage provided by AIRFAC Newport is redundant to the coverage provided by the larger and more capable AIRSTA North Bend and AIRSTA Astoria, and given limited aviation assets, the Coast Guard began exploring the possibility of closing AIRFAC Newport in Fiscal Year 2014, along with AIRFAC Charleston, South Carolina, which also provided redundant SAR coverage. The Coast Guard's budgetary request was approved on January 17, 2014, when the Fiscal Year 2014 Consolidated Appropriations Act, H.R. 3547 was signed into law. The Explanatory Statement clarified that the Coast Guard budget "allows for the closure" of AIRFACs Newport and Charleston.

Before AIRFAC Newport was closed, Newport Fisherman's Wives and Lincoln

County filed a lawsuit seeking an injunction to prevent the closure of the air facility. *Newport Fishermen's Wives, et al. v. United States Coast Guard*, 14-cv-01890 (D. Or. 2014). That lawsuit was ultimately dismissed as moot after Congress passed the Howard Coble Coast Guard and Maritime Transportation Act of 2014 (Public Law 113–281; 128 Stat. 3022). The Act contained a provision prohibiting the Coast Guard from closing any air facility that was in operation on 30 November 2014 without first (1) making certain determinations regarding effect of the closure; (2) providing public notice and opportunity for comment; and (3) notifying Congress. The statute also provides operational flexibility by allowing the Coast Guard to "implement any reasonable management efficiencies within the air station and air facility network, such as *modifying the operational posture of units or reallocating resources* as necessary to ensure the safety of the maritime public nationwide." 14 U.S.C. § 912(b).

## LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 688–90 (2008) (citations and quotation omitted). There are two types of preliminary injunctions: (1) a prohibitory injunction that "preserve[s] the status quo pending a determination of the action on the merits[,]" and (2) a mandatory injunction that "orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F. 3d 873, 878–79 (9th Cir. 2009) (citation modified) (alteration in original). A mandatory injunction "'goes well beyond simply maintaining the status quo pendente lite [and] is particularly disfavored.'" *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (cleaned up). Indeed, "[i]n general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases[.]" *Marlyn Nutraceuticals, Inc.*, 571 F.3d at 879 (internal quotation omitted). The moving party "must establish that the law and facts *clearly favor* [his]

position, not simply that [he] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis original). Where a plaintiff seeks mandatory injunctive relief, "courts should be extremely cautious[.]" *Stanley*, 13 F.3d at 1319.

Plaintiffs seeking a preliminary injunction must establish each of the following: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge where a government agency is a party." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024).

An injunction may be appropriate, alternatively, where: (1) Plaintiffs raise "serious questions going to the merits;" (2) the balance of equities "tips sharply" in the Plaintiffs' favor; and (3) Plaintiffs "satisfy the other *Winter* factors." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (citations omitted). Here, however, the "serious questions" standard does not apply because "[t]his 'less demanding' merits standard requires serious factual questions that need to be resolved in the case." *Assurance Wireless USA, L.P.*, 100 F.4th at 1031. "Thus, parties do not show serious questions when they raise a 'merely plausible claim,' nor can a district court 'forgo [sic] legal analysis just because it has not identified precedent that places the question beyond debate.'" *Id.*

## ARGUMENT

### Plaintiffs Are Unlikely to Succeed on the Merits.

**I.    14 U.S.C. § 912 Provides No Private Cause of Action.**

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517

(2001). "Congress may so empower litigants expressly or implicitly." *UFCW Local 1500 Pension Fund v. Mayer*, 895 F.3d 695, 699 (9th Cir. 2018). If Congress does not provide a private right of action explicitly within a statute's text, Congress may have implied one. *See Lil' Man in the Boat, Inc. v. City and County of San Francisco*, 5 F.4th 952, 958 (9th Cir. 2021). There is no explicit private cause of action contained in 14 U.S.C. § 912.

There is little reason to explore whether there is an implicit private cause of action because the question of "[w]hether a federal statute provides a private right of action almost always arises in the context of a claim against a third party, such as a state or private entity, not ... against the federal government." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1096 (9th Cir. 2005). This is because the APA provides "an alternative means of ensuring that government officials comply with the dictates of a federal statute." *Id.* at 1095. Under the APA "federal action is nearly always reviewable for conformity with statutory obligations without any such 'private right of action' " which makes it "difficult to understand why a court would ever hold that Congress, in enacting a statute that creates federal obligations, has implicitly created a private right of action against the *federal* government, for there is hardly ever any need for Congress to do so." *Id.* at 1095-96 (quoting *N.A.A.C.P. v. Sec'y of HUD*, 817 F.2d 149, 152 (1st Cir. 1987).

Plaintiffs therefore have no chance of prevailing on Count 3 of Oregon's complaint which alleges a violation of 14 U.S.C. § 912 and Count 1 of the NFW's complaint to the extent that it to alleges a statutory violation. Furthermore, neither motion points to an explicit private cause of action in Section 912 or offers to explain why such an action is implied; in fact, neither motion addresses this issue at all. Plaintiffs are limited to asserting claims under the APA.

A.    **Plaintiffs Lack Article III Standing**

"No principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted). This constitutional limitation requires plaintiffs to demonstrate they have standing to sue so that courts do not operate as an open forum for "general complaints about the way in which government goes about its business." *Allen v. Wright*, 468 U.S. 737, 760 (1984), *abrogated by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). "To have standing under Article III, a plaintiff must have (1) a concrete and particularized injury that (2) is caused by the challenged conduct and (3) is likely redressable by a favorable judicial decision." *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020).

To support standing, an injury must be "concrete, particularized, and actual or imminent[.]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). When the alleged injury arises from an "exercise of governmental power" that is "regulatory, proscriptive, or compulsory in nature," the "complainant" must be "presently or prospectively subject to the regulations, proscriptions, or compulsions" at issue. *Laird v. Tatum*, 408 U.S. 1, 11 (1972). "[T]he injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

Plaintiffs primarily allege that failure to maintain an MH-65 helicopter at Newport 24 hours a day, 7 days a week, 365 days a year, will prevent the Coast Guard from timely providing them a rescue should they experience a boating accident or otherwise become submerged in the ocean. Plaintiffs have a generalized interest in how Coast Guard search and rescue operations are conducted, but a

generalized concern is not sufficient to establish a concrete and non-conjectural injury for standing purposes. *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972). Under *Summers v. Earth Island* and subsequent cases, to establish "actual or imminent injury," the injury that a plaintiff association member alleges must be tied to the challenged action, identify a particular site that is at issue in the action, and relate to an imminent future injury, as opposed to a past injury. *Summers*, 555 U.S. 488, 496 (2009). In addition, the plaintiff association member must have a "firm intention to visit" the location at issue. *Id.* "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of 'actual or imminent' injury that our cases require." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992).

Plaintiffs do not have standing to obtain relief on behalf of non-party hypothetical individuals, and anecdotal concerns about past conduct not before this Court cannot supply a basis for injunctive relief for others. "[P]laintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Acknowledging that Plaintiffs have declarations from commercial fisherman who will be at sea, allegations that hypothetical individuals will not visit Newport if the AIRFAC is closed do not support standing.

While commercial fisherman face the perils of the sea, and the declarations from members of Newport Fisherman's Wives, Inc. ("NFW") include commercial fisherman, their alleged injury is not traceable to the closure or even a reduction in operations at the AIRFAC. Plaintiffs allege as injuries death or bodily injury resulting from shipwrecks. But whether ships capsize or individuals fall overboard are events that are wholly outside the control of the Coast Guard and hence are not traceable to its actions. Plaintiffs conflate the failure to prevent an injury with causing the injury

in the first instance. Because Plaintiffs have not shown that the potential injuries they allege would be traceable to conduct by the Coast Guard, they do not have standing.

For purposes of standing, it is insufficient "if the injury complained of is the result of the independent action of some third party not before the court." *Bennet v. Spear,* 520 U.S. at 169 (internal quotation marks, punctuation and citation omitted); *see also San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (holding that where "third-party weapon dealers and manufacturers - not the government defendants - [] raised the prices of assault weapons," the causation prong is not satisfied.). Here, the injuries that Plaintiffs allege rest on the actions of numerous third parties who are not before the Court, including ship operators, equipment manufacturers, as well as the forces of nature. Plaintiffs' allegations ignore all such "speculative links in the chain" of causation, which "must hold" to connect the Coast Guard's decision and the injuries Plaintiffs claim will occur. *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 670 (D.D.C. 1996). The Coast Guard simply does not control, and certainly does not cause, the many factors that contribute to a ship sinking or an individual falling overboard. Nor does the Coast Guard have a legal duty to prevent an injury caused by an intervening third party. While the Coast Guard endeavors to protect as many citizens as possible, it "has no affirmative duty to render aid to a vessel or person in distress." *Korpi v. United States*, 961 F.Supp. 1335, 1346 (N.D. Cal. 1997), *affd*, 145 F.3d 1338 (9th Cir. 1998).[3] Finally, even if AIRFAC Newport closes, which has not

---

[3] In cases brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*, (FTCA), courts have consistently held that "[d]ecisions regarding Coast Guard methods of law enforcement and training" are outside the waiver of sovereign immunity of that act, because they "necessarily involve the allocation of limited financial and personnel resources" and are hence discretionary. *Woodyer v. United States*, 334 F.Supp.2d 1263, 1271 (W.D. Wash. 2004). While the FTCA is not invoked here, the same logic applies – it is left to the discretion of the agency how to allocate its scarce resources. *See also Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) (decisions regarding the equipment to be kept at the various stations, and the EMT training level of the persons stationed there, are fully protected by the discretionary function exception to the FTCA.

happened, helicopters at AIRSTA North Bend and AIRSTA Astoria are capable of reaching anywhere that a helicopter launching from AIRFAC Newport can reach within the Coast Guard's two-hour response time.  Under typical conditions found off the Oregon coast, even an individual in summer clothing would be functionally able to assist in their rescue within two hours of entering the water. Forbes Decl. ¶ 8. Commercial fishermen, required to have immersion suits and inflatable rafts, would have an even greater ability to survive for much longer periods of time.

Plaintiffs argue that Lincoln County suffers a direct harm "including impairment of the County's own emergency response capabilities" but Coast Guard aviation assets are not County assets, and this is not a direct injury to the County.  ECF 39 at 11.  Lincoln County Sheriff gave three examples of how the Coast Guard helicopter is relied upon to provide rapid response to emergencies. ECF 41 at 7-10. Each was responded to from a different location. AIRSTA Astoria in 2010, AIRSTA North Bend in 2018, and AIRFAC Newport in 2019. These cases well illustrate the overlapping SAR coverage provided by the two larger air stations with that provided by AIRFAC Newport. Snaith Decl. ¶¶ 4-6.

Because Plaintiffs have not met their burden to demonstrate that they have suffered an injury in fact caused by the actions of the Coast Guard, they lack standing and are unlikely to succeed on the merits.

**B.      There is No Final Agency Action Pursuant to the APA**

As an initial matter, Plaintiffs have not clarified the final agency action they seek to challenge.  Other than a bare citation to the leading Supreme Court case on this point, the NFW Plaintiffs do not address either prong of the two-prong test set forth in *Bennett v. Spear*, 520 U.S. 154 (1997).  To the extent that Plaintiffs are challenging a Coast Guard decision to close AIRFAC Newport, no such decision has been made, the AIRFAC remains operational, and the President

**Page 14        Defendants' Response to Plaintiffs' Motion for Preliminary Injunction**

has yet to include such a proposal in his budget. There is simply no final agency action.

To the extent that Plaintiffs seek to challenge the Coast Guard decision to position an MH-65 at AIRFAC Newport only on weekends and holidays during the late spring and summer months, such a decision is a temporary modification in operational posture of a unit to reasonably manage the air station and air facility network to ensure the safety of the maritime public. This is a routine reallocation of resource authorized by 14 U.S.C. § 912(b).

The only discrete action that the NFW Plaintiffs reference is a memorandum from Coast Guard Northwest District Commander Rear Admiral (RADM) Fosse temporarily modifying the operational posture of AIRFAC Newport from 05 May through 30 September 2025, which was extended on October 29, 2025. AIRSTA North Bend's request, however, was required by a shortage in qualified air crews, was temporary in nature and included an endorsement emphasizing the need to "plan for the reinstatement of B-1 aircrew staffing at Newport as soon as resource availability allows." Conley Memo 22 May 2025. The approval required AIRSTA North Bend to conduct weekly training events with Coast Guard Stations Yaquina Bay and Depoe Bay, including overnight stays in a B-1 readiness status at the AIRFAC. Furthermore, AIRSTA North Bend was required to resume staffing the AIRFAC "as soon as staffing allows." Reinhold Decl. Exhibit 8 at 3. Although staffing issues were overcome, the extension was required by a mission critical deployment of a helicopter and air crew to AIRSTA San Diego, which, again, was temporary in nature.

Oregon, by contrast, claims multiple acts to be final agency action. In addition to RADM Fosse's approval of the temporary modification of AIRFAC Newport's operational posture, Oregon claims the request for the modification from Captain Bustamente was a final agency action, but a request for approval cannot be a final agency action. Oregon also claims that statements

made by Commander Matthew Edes in an informational public meeting were final actions. CDR Edes is the Chief of External Affairs for Coast Guard Pacific Area and does not have operational control over the deployment of Coast Guard aircraft; however, his statements merely indicated that the change in status was due to staffing shortages, i.e., they were temporary. For both reasons his statements were not final agency action. Not noted by Oregon, but pertinent to its motion, "Commander Edes further stated that the aviation facility would continue to remain in operational order despite the helicopter's absence." ECF 12 at ¶ 6.

Although NFW Plaintiffs do not appear to raise this issue, Oregon argues the Coast Guard's decision to change the operational readiness status of AIRFAC Newport from B-0 to B-1 violates the APA because it is arbitrary and capricious. This challenge is barred by the statute of limitations. Coast Guard District Thirteen (now Northwest District) authorized this change on August 21, 2019, more than six years prior to the filing of these complaints. In doing so, the District specifically commended North Bend "for successfully engaging state and local representatives, including the Lincoln County Commissioner and the Fisherman Wives Association on this proposed change." Reinhold Decl. ¶ 25. All plaintiffs had notice and the opportunity to challenge the operational change at that time and declined to do so. The statute of limitations for bringing an action under the APA is six years. 28 U.S.C. § 2401(a); *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 942–43 (9th Cir. 2006) ("Although the APA itself contains no specific statute of limitations, a general six-year civil action statute of limitation applies to challenges under the APA.").

There is a two-pronged test for determining final agency action under the APA. An agency action is final when: (1) it marks the consummation of the agency's decision-making process and is not merely tentative or interlocutory, and (2) it determines rights or obligations or creates legal

consequences that flow from the action. *Bennett v. Spear*, 520 U.S. 154 (1997). The 9th Circuit applies this test with a focus on "the practical and legal effects of the agency action" *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977 (2006).

Under the first prong of *Bennett*, final action must be a "definitive statement of the [agency's] position," *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990), or the agency's "last word on the matter" at issue, *Oregon Nat. Desert Ass'n*, 465 F.3d at 983, 984. Agency action that is "merely tentative or interlocutory" in nature is not final agency action. *San Francisco Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 577 (9th Cir. 2019) (quotation marks and citations omitted).

This court has previously found that "a routine reallocation of resources" is not considered a final agency action under either prong of the Bennett test. In Northwest Center for Alternatives to Pesticides, the temporary deployment of additional law enforcement personnel to Portland by DHS was "a routine reallocation of resources authorized by 40 U.S.C. § 1315, rather than some separate policy or final decision" and emphasized that it was "a temporary, tentative action taken pursuant to a broad program of assisting federal personnel." *Northwest Center for Alternatives to Pesticides v. U.S. Department of Homeland Security*, 552 F.Supp.3d 1078, 1087-88 (2021). Critically, the court noted that "the decision to send reinforcement personnel to Portland did not represent any definitive statement or final position by the agency, or its 'last word' on any issue." Id. at 1087. The temporary and reversible nature of the deployment, coupled with the agency's demonstrated willingness to modify its position based on changing circumstances, weighed heavily against finding final agency action.

The changes in AIRFAC Newport's operational posture over the summer months were intended to address temporary shortages of qualified air crew; the AIRFAC generally returned to

daily operations by October.  This year's extension of the reduced operations was necessary because of the deployment to meet a mission critical shortage at AIRSTA San Diego and was scheduled to last approximately one month.  By no means was that deployment a final agency decision concerning the closure of AIRFAC Newport.

Temporary changes in operational readiness postures are authorized by 14 U.S.C. § 912(b).  The statute also delineates what marks the consummation of the agency's decision-making process: a proposal submitted to Congress as part of the President's budget.  This is the same decision-making process the Coast Guard used during its prior effort to close the AIRFAC even before the statutory requirement existed.  That the budget proposal is final agency action also makes sense; a proposal to close the AIRFAC in the President's annual budget proposal means that proposal not only has been approved by senior Coast Guard leadership, but also by the Secretary of Homeland Security who must make certain determinations pursuant to the statute.

There also has been no action to reduce the operational capability of AIRFAC Newport.  Every summer helicopters operate at the AIRFAC including this summer when AIRSTA North Bend helicopters operated there weekly for training including occasionally remaining overnight.  Helicopters from both AIRSTA North Bend and AIRSTA Astoria used the AIRFAC and its fuel farm to refuel during missions.  At no point has AIRFAC Newport been closed or operations there been terminated.

Under the second Bennett prong, the change in the operational posture of AIRFAC Newport does not determine rights or obligations or create legal consequences that flow from the change and the NFW Plaintiffs do not even present an argument that it does.  The change in operational posture does not exert law enforcement authority over anyone and it does not have the force of law that will change anyone's rights.  *Columbia Riverkeeper v. U.S. Coast Guard*, 761

F.3d 1084, 1095 (9th Cir. 2014). Oregon claims the procedural requirements of 14 U.S.C. § 912 create a legal right extending to Plaintiffs' "the opportunity to challenge the relocation." ECF 42 at 16. The requirement for public comment and public meeting, however, is located in § 912(a)(3), yet that provision only applies "[p]rior to closing an air facility" and the air facility has not been closed.

For the above reasons, the Coast Guard's modifications to its operational posture at AIRFAC Newport are not final agency actions subject to review.

**C.    The Coast Guard's Operational Decisions are Authorized by 14 U.S.C. § 912(b).**

As previously described, 14 U.S.C. § 912(b) preserves the Coast Guard's operational flexibility to implement reasonable management efficiencies and modify its operational posture or reallocate resources across the air facility and air station network to ensure the safety of the maritime public. The Coast Guard has done nothing more. The AIRFAC has not been closed and has continued its operational capacity to service helicopters including the hanger, the fuel farm, and the spartan quarters for the air crew. The Station Keeper, the only permanently assigned member, remains assigned to the AIRFAC. There have been no permanent and irreversible changes to the operational capability of the AIRFAC as demonstrated by the fact that an MH-65 helicopter was at the AIRFAC within 24 hours of this Court issuing its Order. The NFW Plaintiffs do not explain why modifications to AIRFAC Newport's operational posture violate 14 U.S.C. § 912(b). NFW Plaintiffs' Motion never once even mentions this provision.

The State of Oregon in its response appears to be arguing that defending the Southern border of the United States is irrelevant to and distinct from ensuring the "safety of the maritime public nationwide." ECF 42 at 25. However, the Coast Guard missions, established by statute, *supra*, include homeland security measures, such as drug interdiction, migrant interdiction, and

defense readiness. In any event, the deployed helicopter was supporting Operation Border Trident, which is a Coast Guard operation. Reinhold Decl. ¶ 29. In addition, the temporary reassignment of a helicopter from AIRFAC North Bend was the sole aviation asset supporting the Unified Command responding to a container ship fire in the Port of Los Angeles and also allowed an MH-65 to return to the San Francisco area and subsequently locate a missing person who was unresponsive and under the water. Decl. Reinhold ¶ 7.

**D.      The Coast Guard's Operational Decisions are Not Arbitrary and Capricious.**

An agency acts arbitrarily when it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983).

NFW Plaintiffs' Motion cites this case but only makes a bald assertion that the Coast Guard failed to follow the procedures of 14 U.S.C. § 912(a) for closing an air facility.  The Coast Guard has not closed AIRFAC Newport.  Plaintiffs' never address the 14 U.S.C. § 912(b) authorization for the Coast Guard to modify the operational posture of an air facility and the reasons for do so which were laid out in the memorandum requesting to modify AIRFAC Newport's operational posture and the memorandum approving those modifications.  Reinhold Decl. ¶¶ 29-30. As such, NFW Plaintiffs have not identified a failure to consider an important aspect of addressing the scarcity of qualified air crew or operational aircraft — including that since December 3, 2025, AIRSTA North Bend has only two operational MH-65 helicopters out of the five assigned. Nor have they explained why the Coast Guard's reasons run contrary to the evidence, or why the Coast Guard's modifications are an implausible response to its resource issues.  This Court should reject

their unsupported allegation that the Coast Guard has acted in an arbitrary or capricious manner.

Oregon's Motion asserts that the Coast Guard's modifications to AIRFAC Newport's operational posture are arbitrary and capricious for four reasons, but none of those assertions are valid.

First, Oregon asserts "the average response time from AIRFAC Newport in B-1 posture is 25–30 minutes faster than the response time from AIRSTA North Bend." ECF 42 at 20. This ignores Captain Kent Reinhold's testimony that the difference between response times is "negligible" and that AIRSTA North Bend personnel informed him that there is about a three-minute difference in response times on average since the AIRFAC Newport helicopter moved to a B-1 status. Reinhold Dep. at 32-33. Even if Oregon's calculation of a 25–30-minute difference in response times were true, this ignores the fact that a helicopter launching from AIRFAC Newport is not immediately able to hoist and rescue persons in the water because a helicopter with a full load of fuel weighs too much to be able to hover and hoist a person. The helicopter must burn off sufficient fuel to reduce its weight (and also account for the weight of the people it will be taking aboard) or jettison fuel. Burning off sufficient fuel from a fully fueled MH-65 takes approximately 20 minutes and jettisoning fuel is a 10-minute evolution. An MH-65 launching from North Bend will have already burned off the necessary fuel in transit. A Motor Life Boat from Station Yaquina Bay could also be on scene very quickly. Reinhold Dep. at 115-117.

Second, Oregon argues that the 2019 change in readiness status was a significant reduction in AIRFAC Newport's personnel and use. Factually, this makes no sense because the air crew are not assigned to AIRFAC Newport; if they were, changing their readiness status does not change their presence or assignment to the AIRFAC; and the MH-65 helicopter is still using AIRFAC Newport regardless of its readiness status. Furthermore, any claim concerning this change in

readiness status is barred by the APA's six-year statute of limitations.

Third, Oregon argues that the deployment of a helicopter to AIRSTA San Diego, a scheduled approximately one-month deployment, violates 14 U.S.C. § 912 because it was for a different purpose: enforcement of immigration. Section 912, however, does not specify or restrict a purpose for which the Coast Guard must use an air facility and Coast Guard helicopters are multi-mission aircraft used to accomplish many Coast Guard missions. For example, Oregon complains that not having a helicopter at Newport prevents its university and Fish and Wildlife employees from accomplishing their living marine resources research and fisheries enforcement. While the Coast Guard has statutory authority to assist state agencies in carrying out their missions, this assistance is not even a Coast Guard mission[4] and certainly not a SAR mission. Furthermore, in the week that the helicopter was deployed to AIRSTA San Diego, it flew four times, one of which was to support the Coast Guard's response to the fire aboard the container ship ONE HENRY HUDSON which threatened the Port of Los Angeles, our nation's largest and busiest port. Reinhold Dep at 141-142. This clearly involved maritime public safety. Also, with AIRSTA North Bend's helicopter in San Diego, AIRSTA San Francisco was able increase its capacity and respond to a SAR case that same week illustrating how this deployment had impacts across the air facility and air station network up and down the Pacific coast. The other three flights were in support of Operation Border Trident, a Coast Guard operation to control the nation's southwest maritime border. Reinhold Dep at 29. Furthermore, many migrant interdiction cases end up also becoming SAR cases from overloading boats or reckless operation.

Fourth, Oregon argues that the Coast Guard's ability to maintain a two-hour rescue response to the Newport-area "ignores that hours of immersion in Oregon's cold coastal waters

---

[4] The Coast Guard may assist state agencies and may impose conditions, including reimbursement, on that assistance. 14 USC 701(a).

carries a significant risk of death." ECF 42 at 21. This is a strawman argument that Defendants are not making. As discussed above, an MH-65 launching from North Bend will be in Newport in about an hour, not two hours, and even by Oregon's calculation the maximum difference in response times is half an hour, not two hours. Also, the further the scene of a SAR case moves from Newport, especially as it moves in a northern or southern direction, the more it reduces any difference between a response time from the two air stations.

Finally, Dr. Cyr's declaration concerning survival times in the waters off the coast of Oregon and the other anecdotal declarations submitted in support of the motion are simply wrong. Based on research performed by the U. S. Army Research Institute of Environmental Medicine, the Coast Guard uses a computer program called the Probability of Survival Decision Aid. Dr. Christina M. Forbes, an oceanographer employed by the Coast Guard's Office of Search and Rescue and called upon by SAR operators around the world to provide environmental guidance and parameters for survivability time estimates in extremely challenging cases, used this program to estimate survival times in ocean waters off the Oregon coast. Even a medium sized man or woman, wearing summer clothing, immersed in the water up to their neck at the coldest end of the annual average water temperature range, would be able to functionally assist in their rescue for just under two hours and could survive for over six hours. See Declaration of Christina Forbes ("Forbes Decl.") ¶ 8.

The two-hour SAR response standard does have some utility in evaluating this case. This response standard is a tool which helps the Coast Guard allocate scarce resources across its entire SAR network, including both vessels and aviation assets. In fact, CAPT Reinhold testified that "of all the Coast Guard air stations . . . Astoria, Newport, and North Bend are the closest together across the whole of the Coast Guard in terms of range capability." Reinhold Dep. at 33.

**Page 23     Defendants' Response to Plaintiffs' Motion for Preliminary Injunction**

**E.     The Modifications to AIRFAC Newport's Operational Posture Do Not Implicate the CZMA.**

The Coast Guard's decisions on whether and how to allocate limited staff and resources at AIRFAC Newport for operations do not implicate the CZMA.  Plaintiffs are therefore unlikely to succeed on that claim.  Congress enacted the CZMA in 1972 to encourage wise use of coastal resources through state-developed and federally-approved coastal zone management programs. *See* 16 U.S.C. §§ 1452, 1455.  The CZMA requires that a Federal agency carrying out an activity "within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone" provide the relevant state with a determination that the activity will "be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies" of the state's coastal zone management program.  16 U.S.C. §§ 1456(c)(1)(A), 1456(c)(1)(C).  The coastal zone extends "seaward to the outer limit of State title and ownership," typically three miles, and "inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters, and to control those geographical areas which are likely to be affected by or vulnerable to sea level rise."  *Id.* § 1453(1); *see also Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 862 (9th Cir. 2022).

Federal agencies must provide the state with a consistency determination only for "Federal agency activities affecting any coastal use or resource."  15 C.F.R. § 930.34(a)(1).  "The CZMA does not define 'Federal agency activity,' but the implementing regulations do."  *Env't Def. Ctr.*, 36 F.4th at 886.  "The term 'Federal agency activity' means any functions performed by or on behalf of a Federal agency in the exercise of its statutory responsibilities."  15 C.F.R. § 930.31(a). It "includes a range of activities where a Federal agency makes a proposal for action initiating an activity or series of activities when coastal effects are reasonably foreseeable[.]" *Id.*  Effects may be direct or indirect.  *Id.* § 930.33(a)(1).  Outside of specific circumstances not present here, a

federal agency "is not required to coordinate with State agencies" when it "determines that a Federal agency activity has no effects on any coastal use or resource[.]" *Id.* § 930.33(a)(2); *see also id.* § 930.35(a).

The Coast Guard not deploying a helicopter and related personnel from AIRSTA North Bend to AIRFAC Newport is not a "Federal agency activit[y] affecting any coastal use or resource." *Id.* § 930.34(a)(1). Indeed, plaintiffs do not challenge activity, but alleged inactivity. No helicopter was "relocated" from AIRFAC Newport. ECF 42 at 22. "AIRFAC Newport houses no permanently assigned helicopter and no permanently assigned air crew." Reinhold Decl. ¶ 6. Rather, the Coast Guard temporarily stopped deploying a helicopter and crew from AIRSTA North Bend to AIRFAC Newport in order to maintain a daily presence there but still used the AIRFAC including occasional overnight stays in a B-1 readiness status. *Id.* ¶ 29.

Oregon points to no precedent supporting the idea that an agency's decision *not* to engage in a certain activity, such as deploying staff from their permanently assigned location in North Bend to Newport, is subject to the CZMA. Adopting that interpretation of the CZMA would be contrary to the "ordinary, common meaning" of the word 'activity.' *Transwestern Pipeline Co., LLC v. 17.19 Acres*, 627 F.3d 1268, 1270 (9th Cir. 2010); *United States v. Lillard*, 935 F.3d 827, 833 (9th Cir. 2019) ("The interpretation of a statutory provision must begin with the plain meaning of its language." (quoting *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013)). It is also not the interpretation that the regulations themselves appeared to contemplate. The examples of "Federal agency activity" provided in the regulation concern affirmative actions – "e.g., a Federal agency's proposal to physically alter coastal resources, a plan that is used to direct future agency actions, a proposed rulemaking that alters uses of the coastal zone." 15 C.F.R. § 930.31(a). Further, finding that federal agencies' decisions to not expend limited resources for a

given purpose need to be submitted to a state government for review under the CZMA would be an odd result imposing significant constraints on the Executive Branch. *See Solis v. Saenz*, 60 Fed. App'x 117, 119 (9th Cir. 2003) (courts "take into account common sense, the regulatory purpose, and the practical consequences of [a] proposed interpretation" of regulations and statutes).

The CZMA's requirement that activities "be carried out *in a manner* which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs" also presupposes an agency is performing an activity. 16 U.S.C. § 1456(c)(1)(A) (emphasis added). Oregon's Statewide Planning Goal 19, which Oregon argues the Coast Guard did not comply with, illustrates the point. *See* Or. Mot. 22-23. It provides that "State and federal agencies shall carry out actions that are reasonably likely to affect ocean resources and uses of the Oregon territorial sea in such a manner as to . . . protect and encourage the beneficial uses of ocean resources – such as navigation, food production, [and] recreation" among other interests. ECF 44-5. There is a difference between a command to take action and a command that actions taken be performed in a certain manner. Oregon's proposed interpretation of the Coast Guard's obligations under the CZMA conflates those concepts.

Even if viewed as an activity, Oregon does not establish that the Coast Guard's decision to not position personnel and equipment for search and rescue operations in Newport had "reasonably foreseeable" coastal effects within the meaning of the CZMA. 15 C.F.R. § 930.31(a). Oregon summarily asserts that "loss of this local search and rescue resource" would have a "reasonably foreseeable effect on coastal uses, including navigation, fishing, and recreation[.]" ECF 42 at 23. But Oregon does not actually explain what it believes those reasonably foreseeable effects to coastal uses are or the causal link to the alleged reduced staffing of AIRFAC Newport. Their motion does not argue that the Coast Guard's allocation of personnel and equipment among

facilities prevents any use of the coastal zone, alters what activities can be performed in the coastal zone, or imposes any restrictions on how those activities can be carried out. Nor does their motion explain how the allocation of resources itself causes a threat to safety or "initiates an event or series of events where coastal effects are reasonably foreseeable." 15 C.F.R. § 930.33(a)(1). Plaintiffs' argument that the Coast Guard's decision to not send staff and aircraft from one location to another affects "land or water use[s] or natural resource[s] of the coastal zone," 16 U.S.C. § 1456(c)(1)(A), such that it must provide a consistency determination to a state agency, is "an extravagant view of an agency's obligations under the CZMA[,]" *New York v. U.S. Gen. Servs. Admin.*, 823 F. Supp. 82, 86 (N.D.N.Y. 1993).

Further, as discussed above, the Coast Guard has found that AIRFAC Newport's search and rescue coverage is redundant of that of AIRSTAs North Bend and Astoria. Reinhold Decl. ¶ 22. In addition to the redundant air coverage, fishermen and other boaters within the coastal zone would be within the range of Coast Guard ships that can conduct search and rescue operations. *See* Declaration of Captain Joan Snaith ("Snaith Decl."), ¶ 7; Reinhold Decl. ¶ 10 ("Over 90% of SAR cases off the Oregon coast are within 10 miles of shore and accordingly in range of local Coast Guard SAR surface vessels." Reinhold Decl. ¶ 14). Thus, even if the Coast Guard's staffing of air facilities for search and rescue operations could be a federal agency activity affecting the coastal zone in some cases, it was not here.

Because the Coast Guard not deploying a helicopter and crew to maintain a daily B-1 readiness posture at AIRFAC Newport was not a "Federal agency activity . . . that affects any land or water use or natural resource of the coastal zone," it was not subject to the CZMA. 16 U.S.C. § 1456(c)(1)(A). The Coast Guard therefore did not need to "provide a consistency determination" or "[seek] a consistency review" as Oregon alleges. ECF 42 at 22; *see also* 15 C.F.R. §

930.33(a)(2).  Oregon is therefore unlikely to succeed on the merits of its CZMA claim.

## II.    Plaintiffs fail to demonstrate a likelihood of irreparable harm that favors a preliminary injunction.

In addition to establishing the merits element above, to obtain a preliminary injunction, Plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). The "possibility" of such harm is insufficient. *Id.* Plaintiffs must show both immediacy and likelihood that they will be irreparably harmed absent emergency relief. *See Caribbean Marine Services Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988).

To the extent that the Plaintiffs request a return to the status quo ante since 1987, this request is an extraordinary order to unwind what has already occurred—a so-called "mandatory" injunction.  Such an injunction is "particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co*., 571 F.3d 873, 879 (9th Cir. 2009) (cleaned up). In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id*. (cleaned up).  The record clearly shows that the operational posture at AIRFAC Newport has changed multiple times and in several ways since 1987 including the replacement of less capable 1987 HH-52 helicopters with the more capable MH-65 helicopters.  Reinhold Decl. ¶ 12. The Coast Guard has no operational HH-52 helicopters so returning to the status quo 1987 is neither possible nor desirable, and such a mandatory injunction should be denied.

This Court's TRO required the Coast Guard to return AIRFAC Newport to the status quo ante its "full operational capabilities, infrastructure and personnel support."  This is simple and requires no injunctive relief at all.  The infrastructure and personnel support at AIRFAC Newport have been unchanged since 2018 when the Station Keeper was assigned and the TRO had no

impact on either.  As for the operational capabilities, if this refers to the presence of an MH-65 helicopter at the AIRFAC, the status quo ante for the past five years was to have an MH-65 in a B-1 readiness status at the AIRFAC weekends and holidays from approximately May through September except for in 2025 when the AIRFAC was still used, but on a more intermittent basis. An MH-65 in a B-1 readiness status would be at the AIRFAC the remainder of the year, absent brief periods where weather or qualified crew or helicopter availability precluded that possibility. The Coast Guard intends to maintain this operational posture upon the expiration of the TRO so no further injunctive relief is required.

Plaintiffs have failed to make a sufficient showing of irreparable harm.

## III.    The Balance of Equities and Public Interest Disfavor a Preliminary Injunction

In preliminary injunction proceedings, a party seeking injunctive relief "must [also] establish . . . that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. To determine how the balance of equities tips, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Hawai'i Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court must then weigh "the hardships of each party against one another[.]" *Id*. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation omitted).

Plaintiffs state that the federal government faces no harm from an injunction to obey the law. This is a true statement in a literal sense but ignores the actual costs of maintaining helicopters at both AIRFAC Newport and AIRSTA North Bend, which only has two operational helicopters out of its complement of five. Reinhold Decl. ¶ 32. Since both have to be ready to fly, maintenance

cannot be performed on either. This increases the risk that one of the two might break down and need repairs. If the Court orders the Coast Guard to maintain a helicopter at AIRFAC Newport, that helicopter would be AIRSTA North Bend's only operational helicopter and would be unable to serve AIRSTA North Bend's coverage area, thereby placing southern Oregonians at a greater risk. This just considers the impact on the SAR mission in Oregon without considering the rippling impact on the air facility and air station network. The potential harm in this Court ordering an injunction that obstructs the operations and operational flexibility of the Coast Guard is certainly likely to impact the safety of this Country and its citizens. If the Coast Guard is unable to manage its finite resources to ensure readiness to respond to a local or national emergency, whether it is to respond to a terrorist attack or national disaster or to send a helicopter to a mariner in distress, harm will result - in the loss of lives. It is the Coast Guard and not the Plaintiffs or this Court that can ensure that helicopters are available to carry out the missions of the Coast Guard. If the Coast Guard is unable to remove the helicopter under any circumstances from AIRFAC Newport, there is a real danger when helicopters at other AIRSTA (including that in North Bend) or AIRFAC are without resources. Only if the Coast Guard can appropriately allocate its limited resources can the American public's safety be ensured.

## IV.    Plaintiffs Must Post a Bond

If the Court is inclined to grant a preliminary injunction, it must do so "only if the movant gives security in an amount that the court considers proper to pay the posts and damages sustained by any party to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Accordingly, the Court should require Plaintiffs to post a bond pursuant to Rule 65(c).

<b>CONCLUSION</b>

Based on the foregoing, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

DATED this 5th day of December 2025.

SCOTT E. BRADFORD
United States Attorney
District of Oregon

*/s/ Susanne Luse*
SUSANNE LUSE
Assistant United States Attorney
*Attorneys for Defendant*