**Eric J. Brickenstein**, OSB No. 142852
Email: eric@northcurrentlegal.com
**Mark J. Kimbrell**, OSB No. 143607
Email: mark@northcurrentlegal.com
**NORTH CURRENT LEGAL LLC**
1050 SW 6th Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 489-9020

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
(Eugene Division)

| | |
|---|---|
| **NEWPORT FISHERMEN'S WIVES, INC.,** an Oregon nonprofit corporation and **LINCOLN COUNTY,** a political subdivision of the State of Oregon,<br><br>Plaintiffs,<br>v.<br><br>**UNITED STATES COAST GUARD**, an agency of the United States Department of Homeland Security, and **KRISTI NOEM** in her official capacity as the Secretary of Homeland Security<br><br>Defendants. | Case No. 6:25-cv-02165-AA (Leading Case)<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Consolidated with:<br>*State of Oregon v. Noem, et al.*<br>No. 6:25-cv-02172-AA (Trailing Case) |

# MEMORANDUM

I. **INTRODUCTION**.

In open disregard of Congress, defendants United States Coast Guard and Secretary of Homeland Security Kristi Noem removed a rescue helicopter that has been deployed to AIRFAC Newport on an around-the-clock basis for decades. Defendants' actions put lives in danger along Oregon's central coast. This lawsuit followed, and on November 24, the Court ordered defendants to immediately return the Newport rescue helicopter. The facts and law that supported the Court's decision to grant an emergency restraining order two weeks ago have not changed. The Court should grant plaintiffs Lincoln County (the "County") and Newport Fishermen's Wives, Inc.'s ("NFW") motion and enter a preliminary injunction.[1]

II. **DEFENDANTS RELY ON CONTRADICTORY ASSERTIONS**.

Before turning to defendants' legal arguments, it is important to address some of defendants' factual claims. Three of the most problematic claims are discussed below. Each should be discounted in the Court's analysis.

First, defendants claim that Dr. Cyr's testimony "concerning the survival times in the waters off the coast of Oregon . . . [is] simply wrong." Def's Br. at 23. The issue is important because survival times in cold water relate directly to the increased risk of death caused by defendants' removal of the Newport rescue helicopter and plaintiffs' corresponding need for an injunction. In support of their position, defendants rely on the declaration of Dr. Christine

---

[1] If the Court takes this motion under advisement, the Court should extend the current restraining order for cause pursuant to FRCP 65(b)(2).

**Page 2 – PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Forbes, who states that an average male dressed in summer clothing and immersed in turbulent, 50-degree water, will remain functional and able to assist in his own rescue for up to 5.9 hours, with a survival time of 8.5 hours. Forbes Decl. ¶ 8.

Anyone who has dipped a toe in the water at Oregon's beaches will grasp the absurdity of defendants' claim. But, more importantly, Dr. Forbes' testimony is contradicted by what the Coast Guard says on the matter outside of this litigation. In 2006, for example, the Coast Guard's Commercial Fishing Vessel Safety Program published a document titled "Cold Water Survival & Hypothermia – You May Not Know As Much As You Think." In that document, the Coast Guard articulates the fatal flaw in Dr. Forbes' analysis:

> People often do not die of actual hypothermia but from a variety of problems where mild hypothermia causes them to lose their physical and mental ability to survive. . . . It is the early period of the accident that victims do not survive water immersions even though they fall in the "safe" boundaries established on hypothermia survival charts. The majority of deaths (over half) occur in the two stages before hypothermia actually develops. This period is often ignored but where preventative efforts should be focused -- protection against the short-term incapacitating effects and protection from drowning.

Supp. Brickenstein Decl., Ex. A. The Coast Guard goes on to explain that cold shock "severity is proportional to temperature (colder temperature, higher shock) and peaks between 50 to 59 [degrees]," and that this "partly explains many deaths that occur in water as high as 50 [degrees], long before standard survival curves would predict." *Id.* Thus, the Coast Guard concludes, death can occur in as little as "between 3 and 30 minutes after immersion." *Id.*

As such, the Cyr Declaration aligns with the Coast Guard's own public guidance. It provides an accurate statement of maritime safety science and the immediate dangers faced by a person immersed in cold water off the central Oregon coast. The Forbes Declaration does not.

Second, and relatedly, despite acknowledging that the response time from Newport is at least minutes faster than that from North Bend, defendants insist that the Newport rescue helicopter is redundant with helicopter assets launched from AIRSTA North Bend. Def's Br. at 27. But, as Dr. Cyr explains, in cold water emergencies, minutes matter. Accordingly, even under the Coast Guard's response time assessment, there is no redundancy—only the life-threatening risk created by the Coast Guard's action.

Regardless, the Coast Guard's "redundancy" claim is based on a paper exercise that compares the maximum allowable launch time of one hour in a Bravo-1 readiness posture (AIRFAC Newport) and 30 minutes in a B-0 posture (AIRSTA North Bend). But as Captain Reinhold testified, AIRFAC Newport routinely launches in about 30 minutes—much faster than the maximum allowed, and equivalent to the launch time from AIRSTA North Bend. ECF No. 44–3, Reinhold Dep., p. 24, l. 9–18. Defendants also do not account for slowed flight time from North Bend in bad weather (a regular feature of winter at the Oregon coast) or situations where conditions prevent a helicopter located at AIRSTA North Bend from reaching the waters off the Newport area at all. ECF No. 43–2, Reinhold Dep., p. 84, l. 16–p. 86., l. 21. In short, defendants' claim that the Newport rescue helicopter merely duplicates the local emergency response capabilities of AIRSTA North Bend is—like defendants' suggestion that an average person can function for nearly six hours immersed in turbulent 50-degree water—not credible.

Third, defendants' claim that the "potential harm in this Court ordering an injunction . . . is certainly likely to impact the safety of this Country and its citizens." Def's Br. at 30. But if returning the Newport rescue helicopter was likely to weaken the safety of the United States,

**Page 4 – PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

then why was the government "scheduled" to return the helicopter by mid-December 2025 for the Dungeness crab season and to keep it in place at least through Spring of 2026? *Id.* at 7. Taking defendants at their word,[2] those plans cannot be reconciled with defendants' claim that they will suffer hardship if an injunction issues.

These contradictions expose defendants' minimization of the radical change and gravity of harm caused by their illegal removal of the Newport rescue helicopter for what it is: a smokescreen. They also underscore exactly why Congress established the procedural protections contained in 14 U.S.C. § 912(a) that defendants have brazenly ignored.

## III. ARGUMENT.

### A. Plaintiffs Request a Prohibitory Injunction.

Defendants assert that the heightened legal standard applicable to mandatory injunctions applies in this case. Def's Br. at 9. It does not. Rather, where, as here, a defendant changes the status quo and plaintiff seeks relief to restore it, the injunction is prohibitory. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 685 (9th Cir. 2023) ("Because it was the District's action that affirmatively changed that status quo and Plaintiffs' motion for a preliminary injunction seeks to restore that status quo, the relief sought is properly viewed as a prohibitory injunction.") (internal quotation omitted); *Youth 71Five Ministries v.*

---

[2] There is good reason to doubt defendants' post hoc explanations of their intentions regarding AIRFAC Newport. Captain Reinhold admitted during his deposition, for example, that, as recently as November, the Coast Guard had ordered the removal of AIRFAC Newport's signage demarcating the area as a Coast Guard facility. Supp. Brickenstein Decl., Ex. B, Reinhold Dep. p. 98, l. 18–p. 99, l. 15.

*Williams*, No. 24-4101, 2025 WL 3438455, at *5 (9th Cir. Nov. 26, 2025). Full-time presence of the Newport rescue helicopter at AIRFAC Newport has been the status quo for decades. Plaintiffs simply seek to maintain that status quo.

    **B.**    **Plaintiffs are Highly Likely to Succeed on the Merits.**

              **1.**    **Plaintiffs have standing.**

Article III standing requires a concrete and particularized injury that is traceable to the defendant's conduct and redressable by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). Threatened injury may establish injury in fact. *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002). Applying the correct legal standard, each plaintiff in this case has standing.

Defendants argue that plaintiffs have merely a "generalized interest in how Coast Guard search and rescue operations are conducted," and claim that plaintiffs "conflate the failure to prevent an injury with causing the injury." *Id.* at 11–12. Defendants' arguments fail because they misstate the nature of plaintiffs' injury and ignore the facts.

The issue is not whether the Coast Guard controls if ships capsize. *Id.* at 12. The issue, rather, is whether defendants' removal of the Newport helicopter eliminates a vital safety net when those (and other) emergencies invariably occur.

As NFW board member Taunette Dixon explains in her declaration, defendants' removal of the Newport rescue helicopter increases the risk of harm to her vessel and crew in an emergency. ECF No. 11, Dixon Decl. ¶¶ 6–7. Additionally, NFW and its members, including Ms.

Dixon, provide direct financial and emotional relief to families who lose loved ones at sea.³ *Id.* ¶ 8; ECF No. 9, Bostwick-Terry Decl. ¶¶ 8–9 ("we are the ones who hold the hands of the grieving families while preparing meals, communicating with funeral homes, and providing memorial service assistance."). This is a vital but unenviable duty that will increase as a direct result of defendants' actions. ECF No. 10, Cyr Decl. ¶ 13 ("The relocation of Newport's rescue helicopter will directly and predictably cost lives."). Likewise, as Lincoln County Commissioner Walter Chuck explains in his declaration, loss of the rescue helicopter "will place additional strain on the County's first responders, impacting the County's ability to govern and serve its residents." ECF No. 13, Chuck Decl. ¶ 6. And, but for defendants' failure to comply with the Act, plaintiffs would have participated in the public process that they advocated for in 2014 and that could have changed defendants' decision-making.

The harms described in plaintiffs' complaint and supported by the declarations contained in the record are not "generalized grievances," and plaintiffs are not required to wait for someone to die before bringing their case. *See Cent. Delta Water Agency*, 306 F.3d at 947 (9th Cir. 2002). *Cent. Delta Water Agency* is instructive. In that case, state and local agencies and local farmers challenged the United States Bureau of Reclamation's planned reservoir discharge, arguing that the discharge would raise salinity levels and damage their crops. The Ninth Circuit denied summary judgment on standing grounds, finding that "[p]laintiffs need not wait to challenge the

---

³ In its opinion granting plaintiffs' motion for temporary restraining order, the Court described declarant Gary Ripka as a member of NFW. Plaintiffs wish to clarify that while Mr. Ripka has deep knowledge of local maritime dangers and his testimony is valuable in explaining the importance of the Newport rescue helicopter, he is not an NFW member.

**Page 7 – PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Bureau's action until . . . their crops are damaged or destroyed." *Id.* at 948; *see also Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996) ("the incremental risk [of wildfire] is enough of a threat of injury to entitle plaintiffs to be heard").

Plaintiffs are not seeking "relief on behalf of non-party hypothetical individuals." *Cf.* Def's Br. at 12. Nor are plaintiffs' claims based on "anecdotal concerns about past conduct," as defendants assert. *Id.* Rather, plaintiffs seek an injunction to prevent direct harm to their unique interests that they will suffer if defendants proceed with their illegal removal of the Newport rescue helicopter that has afforded plaintiffs and their loved ones a measure of protection for decade. Plaintiffs' injuries are not caused by some third-party or act of God. *Cf. id.* at 13. Rather, they are the direct result of defendants' actions and are redressable by an injunction that this Court should promptly enter.

### 2. The June 29 Fosse Memorandum and the October 29 Giard Memorandum are Final Agency Actions.

Final agency actions are subject to challenge under the Administrative Procedures Act ("APA"). An agency action is final if it marks the consummation of the agency's decision-making process and is one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997) (quotations omitted).

On June 29, 2025, Coast Guard Admiral Charles Fosse executed a memorandum suspending the standing of a rescue helicopter in B-1 readiness posture at AIRFAC Newport through September 2025. ECF No. 44–4 at 12. The complete elimination of AIRFAC Newport's

B-1 readiness posture authorized in the Fosse Memorandum marked the single most significant downgrade in the facility's use in its 38-year history.

Admiral Fosse's June memorandum stated his "expectation" that AIRSTA North Bend would "resume standing the watch as soon as staffing allows." *Id.* But when staffing issues resolved, the Coast Guard did not resume "standing the watch" at AIRFAC Newport. Instead, on October 29, Senior Program Manager Scott Giard issued a second memorandum stating that "[a]lthough the staffing issues . . . were overcome, mission critical deployments of aviation personnel preclude the reconstitution of a Bl readiness at Air Facility Newport. The referenced "mission critical deployments" involved repositioning the rescue helicopter to the southern border to assist with migrant interdictions.

Contrary to what defendants imply in their response brief, the Giard memorandum contains no reference to any date by which the Newport rescue helicopter would be returned and the Coast Guard's use of AIRFAC Newport would return to historic baselines. Rather, the suspension of operations at AIRFAC Newport authorized by the Giard memorandum is, on its face, indefinite. The Giard memorandum marked the first time since AIRFAC Newport's establishment during the Reagan Administration that the Coast Guard would not stand up a 24/7 rescue helicopter watch at the facility during Oregon's foul-weather seasons. ECF No. 43–2, Reinhold Dep., p. 84, l. 1–5.

In short, defendants chose to downgrade the Coast Guard's search and rescue operations on Oregon's central coast by significantly reducing its use of AIRFAC Newport in favor of prioritizing migrant interdiction at the southern border. There was nothing interlocutory about

that decision. Likewise, legal and everyday consequences flowed from the decision, including reduced life-saving operational capabilities at AIRFAC Newport and violations of the Act.

In their response, defendants offer no explanation as to how the Fosse and Giard memoranda are somehow not final agency actions under *Bennett*. Instead, defendants insist, without factual support, that the removal of the rescue helicopter from AIRFAC Newport was "temporary in nature." Def's Br. at 15. Leaving aside the credibility questions raised by defendants' insistence that they intended to return the rescue helicopter to Newport in time for crab season, the fact that a decision changes an agency's conduct temporarily does not mean that decision can evade judicial review. *Sackett v. E.P.A.*, 566 U.S. 120, 127 (2012) ("The mere possibility that an agency might reconsider [its decision] does not suffice to make an otherwise final agency action nonfinal."); *see also Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089, 1108–110 (9th Cir. 2025) ("a federal agency's assessment, plan, or decision qualifies as final agency action even if the ultimate impact of that action rests on some other occurrence.").[4]

---

[4] Defendants' reliance on *Nw. Ctr. for Alternatives to Pesticides v. U.S. Dep't of Homeland Sec.*, 552 F. Supp. 3d 1078, 1087 (D. Or. 2021) is misplaced. That case involved short term redeployment of troops to respond to exigent circumstances in an emergency. The facts were a far cry from the detailed memoranda that underwrite defendants' policy choice to remove the Newport rescue helicopter at issue in this case. Indeed, under defendants' theory they could permanently evade judicial review simply by leaving the Giard memorandum in place. That is not the law.

**Page 10 – PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

In sum, the June 29 memorandum authorizing the first complete removal of the rescue helicopter from AIRFAC Newport in its history and the subsequent indefinite extension of that decision on October 29 are final agency actions subject to challenge under the APA.

### 3. Removal of the Newport rescue helicopter triggers the Act's requirements.

Apart from defendants' unpersuasive challenges to plaintiffs' standing and reviewability, defendants' core defense on the merits is that removal of the Newport rescue helicopter did not trigger the Act's requirements. According to defendants, the unprecedented and indefinite removal of the Newport rescue helicopter is simply an exercise of "the Coast Guard's operational flexibility to implement reasonable management efficiencies." Def's Br. at 19. Defendants' argument ignores Congress's intent, the plain language of the Act, and the facts on the ground.

As they did in their motion for temporary restraining order, plaintiffs acknowledge that 14 U.S.C. § 912(b) reserves to the Coast Guard certain operational flexibility. But defendants' interpretation of § 912(b) is so broad that it would render § 912(a) meaningless. It is beyond reasonable dispute that defendants' complete elimination of the historical 24/7 presence of AIRFAC Newport's sole aerial asset—the *raison d'etre* for the facility's establishment in 1987 and its preservation by Congress in 2014—is a "significant reduction in personnel and use" that amounts to a "cessation of operations" at the facility. 14 U.S.C. § 912(a)(3), (4).

As this Court explained in its order granting plaintiffs' motion for temporary restraining order, the operational flexibility afforded by § 912(b) "does not, by the plain terms of § 912(a), extend to decisions which close, cease operations, or significantly reduce personnel and use of a Coast Guard air facility." Order at 10. That is exactly what defendants did when they removed

the rescue helicopter from AIRFAC Newport indefinitely pursuant to the June 29 and October 29 memoranda. Defendants' actions are, on their face, outside the bounds of § 912(b) and squarely within the ambit of § 912(a).

### 4. Defendants Violated the Act and the APA Provides a Remedy.

Defendants' removal of the Newport rescue helicopter required them to follow the procedures mandated by § 912(a). But defendants did not follow Congress's instruction. Supp. Olsen Decl., Ex. 2 (Coast Guard responses to Plaintiffs' Requests for Admission Nos. 6–12). Instead, they removed the Newport helicopter in secret.

The APA requires the Court to "hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," that is "in excess of statutory . . . limitations," or that is "without observance of procedure required by law." 5 U.S.C. § 706(2). Likewise, the Court must "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at § 706(1).

Here, defendants' removal of the Newport rescue helicopter in disregard of every one of the Act's protections was plainly not in accordance with law. It was also done, "in excess of statutory . . . limitations" expressly imposed by the Act, and "without observance of procedure required by [the Act]." *Id.* at § 706(2). Accordingly, defendants' actions must be "[held] unlawful and set aside." *Id.* Insofar as defendants seek to remove the rescue helicopter from AIRFAC Newport in the future, they must be compelled to follow the Act's mandates, including §

912(a)(5)'s 18-month post-notice waiting period, which have to date been unlawfully withheld. *Id.* at § 706(2); 14 U.S.C. § 912(a)(5).[5]

### C. Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

The irreparable harm that plaintiffs will suffer without an injunction is palpable. As this Court explained, "[p]laintiffs have presented compelling evidence of a grave risk to the lives of the Newport fishermen in the coming Dungeness crab fishing season, as well as risks to the other members of the community which rely on the Newport Air Facility for helicopter rescue." Order at 11. Defendants' response does not change that analysis in the slightest.

Defendants' statement that a return to the literal "status quo 1987 is neither possible nor desirable" due to equipment changes is unserious. Plaintiffs are not requesting the return of retired HH-52 helicopters any more than they are requesting that pilots who patrolled the skies above Newport in the 1980's be returned to their post. But plaintiffs will decidedly suffer irreparable harm if defendants are permitted to abandon the status quo of 24/7 rescue helicopter coverage at AIRFAC Newport.

Defendants' also claim that restoring full operational capabilities, infrastructure and personnel support to AIRFAC Newport "requires no injunctive relief at all," because the facility's operational posture and staffing has ostensibly been "unchanged since 2018." Def's Br. at 28. Defendants' argument ignores reality. Defendants removed AIRFAC Newport's central asset, catastrophically degrading the facility's core operational capability: rapid search and

---

[5] Plaintiffs incorporate the State of Oregon's arguments regarding the arbitrary and capricious nature of defendants' actions as though fully set forth herein.

**Page 13 – PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

rescue response. Likewise, defendants' removal of the rescue helicopter's support team that had been standing by around-the-clock at the facility obviously degraded AIRFAC Newport's personnel support. *Cf. id.* The Court's TRO restored AIRFAC Newport's function. The restored status quo should now be maintained through a preliminary injunction.

### D. The Balance of Equities and the Public Interest Weigh Heavily in Favor of an Injunction.

The balance of equities and public interest also tip sharply in favor of an injunction. Plaintiffs have submitted compelling evidence that explains in detail the grave threat to life-safety created by defendants' actions. As the Court put it, "[p]laintiffs have made a compelling showing that public safety, and by extension the public interest, are deeply intertwined with the continued operation of the Newport Air Facility, particularly as the fishermen prepare for the most dangerous season of the year." Opinion at 12. The Court also noted that "Congress expressed, in no uncertain terms, that the Secretary must make certain determinations and follow notice and comment procedures for the public and provide notification to Congress before closing or even significantly reducing the use of a Coast Guard air facility," which defendants have since admitted that they did not do. *Id.*

Defendants have made no countervailing showing that the equities or public interest tips in their favor. At most, defendants vaguely insist that restricting the Coast Guard's discretion could "impact the safety of this Country" in the event of a hypothetical "terrorist attack or national disaster." Def's Br. at 30. But restricting the Coast Guard's discretion to take the action that it did in this case (at least, without adhering to the prescribed procedures) is a decision that Congress made and that President Trump signed into law. In any event, defendants' speculation

**Page 14 – PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

regarding a hypothetical national emergency cannot overcome the concrete public interest in maintaining the life-saving safety net that has protected plaintiffs and their community for decades. And, as discussed above, defendants' purported hardship is inconsistent with their stated intend to maintain the rescue helicopter at Newport at least through spring 2026.

    E.    **No Bond Should be Required.**

Defendants make no argument to support requiring bond beyond a bare citation to FRCP 65(c). But as plaintiffs' explained in their motion, in the context of public interest litigation like this case, the Ninth Circuit has a "long-standing precedent that requiring nominal bonds [or no bond] is perfectly proper. . . ." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). Defendants offer no rejoinder, no explanation as to why a bond is necessary, and no proposed bond amount. The Court can and should waive bond.

**IV.    CONCLUSION.**

Plaintiffs' Motion for Preliminary Injunction should be granted.

DATED this 8th day of December, 2025.

    /s/ Eric J. Brickenstein
**Eric J. Brickenstein**, OSB No. 142852
Email: eric@northcurrentlegal.com
**Mark J. Kimbrell**, OSB No. 143607
Email: mark@northcurrentlegal.com
**NORTH CURRENT LEGAL LLC**
1050 SW 6th Avenue, Suite 1414
Portland, Oregon 97204
Phone: (503) 489-9020